No. 88-516

IN THE SUPREME COURT OF THE STATE OF MONTANA

1989

NORTH FORK PRESERVATION ASSOCIATION,

    Plaintiff and Respondent,

    -vs-

DEPARTMENT OF STATE LANDS, a Department
of the State of Montana,

    Defendant and Appellant
    and
FARMERS UNION CENTRAL EXCHANGE (CENEX),

    Intervenor and Appellant.

APPEAL FROM:   District Court of the Eleventh Judicial District,
               In and for the County of Flathead,
               The Honorable Michael Keedy, presiding Judge.

COUNSEL OF RECORD:

    For Appellant:

        Tommy H. Butler argued, Dept. of State Lands, Helena,
        Montana
        Doug James argued; Moulton, Belligham, Longo & Mather,
        Billings, Montana
        Dana L. Christensen; Murphy, Robinson, Heckathorn &
        Phillips, Kalispell, Montana

    For Respondent:

        Jon L. Heberling argued; McGarvey, Heberling, Sullivan &
        McGarvey, Kalispell, Montana
        Andrew Bittker argued, Kalispell, Montana

                              Submitted:   June 15, 1989

                                Decided:   August 22, 1989

Filed:

_____
                          Clerk

Mr. Justice R. C. McDonough delivered the Opinion of the Court.

This appeal involves an oil and gas lease on school trust land within the Coal Creek State Forest, which was acquired from the State by the Farmers Union Central Exchange (Cenex). School trust lands are administered by the Department of State Lands (Department), which issued the lease to Cenex. Pursuant to an Annual Operating Plan approved by the Department, Cenex proposes to drill an exploratory well on its leased tract. North Fork Preservation Association (North Fork) has challenged the Department's approval of Cenex's operating plan, alleging that the Department failed to prepare an environmental impact statement on the proposed well as required by law. North Fork filed its complaint in the District Court of the Eleventh Judicial District, Flathead County, and obtained a summary judgment in its favor. The judgment set aside the Department's approval of Cenex's operating plan; issued a writ of mandate directing the Department to prepare an environmental impact statement; and awarded costs, fees and a small money judgment. We reverse, and remand the case to the District Court for entry of judgment in favor of the Department. We hold that the District Court incorrectly applied the "clearly erroneous" standard for reviewing the Department's decision and misinterpreted applicable statutory and case law. We further hold that the Department's decision was proper under the correct, "arbitrary, capricious or unlawful" standard of review, and that mandamus was not a proper remedy in this case, as mandamus is not available to compel a discretionary act.

The parties have stated a number of issues, some of which overlap:

2

As Stated by the Department:

1. Whether the Department must prepare an environmental impact statement on the drilling of a single exploratory well on school trust land which had been previously clear-cut of timber and is managed under the multiple use concept.

2. Whether the Department is required to prepare a site-specific environmental impact statement concerning full-field oil and gas development.

3. Whether mandamus is an inappropriate remedy to enforce the provisions of the Montana Environmental Policy Act.

4. Whether North Fork Preservation Association sustained its burden of proof.

As Stated by Cenex:

1. Did the District Court apply the wrong standard of review in reviewing the State Lands' decision that approval of Cenex's plan to drill one exploratory well was not a major action of state government significantly affecting the quality of the human environment?

2. Whether State Lands' decision that an environmental impact statement was not required was arbitrary and capricious.

3. Whether the 1984 preliminary environmental review was sufficient, as a matter of law, without considering the "cumulative impacts" of oil and gas development and production.

4. Whether a writ of mandamus will lie to compel the preparation of an environmental impact statement.

As Stated by North Fork:

1. Did the District Court apply the wrong standard of review to State Lands' procedural decision to forego an environmental impact statement?

2. Whether the Cenex operating plan "may significantly affect environmental attributes recognized as being

endangered, fragile, or in severely short supply." ARM 26.2.603(3)(a).

3. Piecemealing: At what stage in the oil and gas lease process is an environmental impact statement on development legally required?

4. Is there a separate ground supporting the District Court's decision, which State Lands and Cenex did not raise on appeal?

5. Whether the 1984 preliminary environmental review was legally sufficient, particularly in its evaluation of cumulative impacts.

6. Whether a writ of mandate will lie to compel preparation of an environmental impact statement.

In April of 1975, the Department received applications for oil and gas leases on 14 tracts of school trust land in the Coal Creek State Forest. The Department deferred action on possible leases until an environmental impact statement (EIS) could be prepared. Coal Creek State Forest is bordered on three sides by National Forest Service land, and on the fourth side by the North Fork of the Flathead River. The river is part of the National Wild and Scenic Rivers System, as well as the western boundary of Glacier National Park.

The surrounding National Forest Service land was also the subject of oil and gas development proposals at about the same time. In 1976, the National Forest Service issued a draft EIS concerning proposed leases on land in its charge. The Department also issued an EIS in 1976. The introduction to the Department's EIS stated that the National Forest Service EIS dealt with the impacts of oil and gas leasing in the larger area surrounding Coal Creek, and the Department's EIS would therefore focus only on the state lands involved and should be considered "an extension of that made by the federal government." The Department's EIS permitted leasing

4

of all 14 Coal Creek tracts. However, at a meeting of the State Board of Land Commissioners held in March of 1976, all of the bids received were rejected. The National Forest Service subsequently undertook a new environmental analysis of the area, and abandoned its 1976 draft EIS.

In 1982, the Department received new applications for oil and gas leases covering a larger portion of the Coal Creek area. The Department prepared a preliminary environmental review (PER) for the purpose of determining whether issuance of oil and gas leases would be an action by state government "significantly affecting the quality of the human environment," therefore requiring an EIS under § 75-1-201, MCA. The PER was issued in 1983, and concluded that no such significant effect would result if certain protective stipulations were included in any leases granted.

The Department then offered leases in Coal Creek State Forest at public auction. Cenex purchased leases to 17 tracts. Each lease contained 16 environmentally protective stipulations. Under these stipulations, Cenex was required to submit an annual operating plan to the Department detailing all activities to be carried out on the leased acreage during the coming year. No activity could be undertaken until written approval of each year's plan was received from the Department.

Cenex's first annual operating plan was submitted in 1984. The plan proposed drilling an exploratory well on one of the leased tracts located approximately three miles south of the town of Polebridge and one mile west of Glacier Park. The proposed well site was a clear-cut left from previous logging under lease from the Department. Cenex planned to make improvements to an existing logging road in order to transport necessary drilling equipment and supplies. The Department delayed approval of the plan while it completed a

site-specific PER, held two public hearings and received comments on the PER during a 30-day review period. After reviewing the comments, the Department issued a supplement to the PER. The Department then approved the plan, subject to 31 additional protective stipulations.

In February of 1985, North Fork filed this action. The complaint sought an order setting aside the Department's approval of the Cenex operating plan and the Cenex lease, and a writ of mandate directing the Department to prepare an EIS on the cumulative effects of oil and gas development in the Coal Creek area. Cenex successfully petitioned to intervene as a defendant in the case. The Department and Cenex filed a motion for summary judgment, as did North Fork. In 1988, the District Court issued a Memorandum and Order granting North Fork's motion, and subsequently entered judgment in North Fork's favor. This appeal followed.

The many issues taken up by the parties have rendered their arguments difficult to follow. North Fork has gone so far as to attempt a "chart of corresponding issue numbers" in its brief to this Court. A careful reading of the issues and arguments offered, as well as the record from below, shows that the parties are posing three core questions:

1. Did the District Court apply the proper standard of review?

2. Did the Department proceed properly in approving Cenex's annual operating plan?

3. Is mandamus an appropriate remedy to enforce provisions of the Montana Environmental Policy Act?

We will proceed with our review by addressing these three questions.

I.

The District Court looked to the Montana Administrative Procedure Act (MAPA) for its standard of review. The court applied the standard of review found in § 2-4-704(2)(e), MCA:

> (2) ... The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
> ...
> (e) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record.

On appeal, the Department and Cenex argue that the "clearly erroneous" standard was improper in this case. Cenex specifically argues that § 2-4-704, MCA, was inapplicable, because the section deals with judicial review of "contested cases", and this was not a contested case. A "contested case" is defined at § 2-4-102(4), MCA, as a proceeding before an agency where a "determination of legal rights, duties, or privileges" of a party is required to be made after an opportunity for hearing. In contrast to cases such as State ex rel. Montana Wilderness Association v. Board of Natural Resources and Conservation (1982), 200 Mont. 11, 648 P.2d 734, no hearing was requested or held before the Department in this case. North Fork did not initiate this action until after the Department had approved Cenex's operating plan. There was no "evidentiary record" against which to measure the Department's decision and determine whether it was clearly erroneous. Cenex is therefore correct in asserting that § 2-4-704, MCA, does not apply in this case.

Both Cenex and the Department argue that the District Court should have employed an "arbitrary and capricious" standard. The Department asserts that decisions by administrative agencies are given deference by reviewing courts due

7

to the agencies' access to superior expertise, and are not overturned unless arbitrary or capricious. The Department notes that in Wilderness Association, 648 P.2d at 740, this Court cited deference to agency expertise as one of three important factors in selecting a standard of review in a contested case. Cenex notes that the arbitrary and capricious standard was used prior to the enactment of MAPA, and would logically apply in this case. Our decision in Langen v. Badlands Cooperative State Grazing District (1951), 125 Mont. 302, 308, 234 P.2d 467, 470, which is cited by Cenex, is relevant to both points:

> The review by the district court is only for the purpose of determining the legal rights of the parties involved. This is so because of the division of governmental powers under the Constitution, neither the district court nor the Supreme Court may substitute their discretion for the discretion reposed in boards and commissions by the legislative acts. [citations]
>
> . . .
>
> The appeal from the commission to the district court is for the purpose merely of determining whether upon the evidence and the law the action of the commission is based upon an error of law, or is wholly unsupported by the evidence, or clearly arbitrary or capricious. On such review courts will only inquire insofar as to ascertain if the board or commission has stayed within the statutory bounds and has not acted arbitrarily, capriciously or unlawfully. [citations]

Both sides agree that because the Montana Environmental Policy Act (MEPA) is modeled after its federal counterpart (NEPA), this Court can look to federal decisions under NEPA as an aid to addressing cases under MEPA. See Kadillak v. Anaconda Co. (1979), 184 Mont. 127, 602 P.2d 147. In fact, North Fork argues that we should adopt the "reasonableness" standard utilized by the U.S. Court of Appeals for the Ninth Circuit in cases cited in North Fork's brief. While looking

8

to federal decisions is not always conclusive, cases decided on analogous facts can shed light on a given issue.

The United States Supreme Court recently took up two companion cases involving the issues at bar. In one of those cases, Marsh v. Oregon Natural Resources Council (No. 87-1704, May 1, 1989), 57 LW 4504, the Supreme Court addressed the issue of the proper standard for review of an agency decision not to amend a previously-issued EIS. The argument before the Court was that newly-discovered information cast doubt on the agency's previous conclusion that the proposed project would not significantly affect the environment. The agency involved had decided that the information did not raise questions sufficient to require amendment of the EIS.

This case presents an analogous question. North Fork alleged several specific shortcomings in the procedure followed by the Department in approving Cenex's annual operating plan. The thrust of these contentions, when taken together, is that the information gathered by the Department indicated that Cenex's proposed well would generate a significant impact on the human environment, and an EIS should have been prepared.

As in any comparison between federal and Montana law, there is a distinction between Marsh and this case. In Marsh, the federal Administrative Procedure Act was applicable where in this case MAPA judicial review provisions do not apply. However, the federal act offers several possible standards of review. In choosing a standard, the Supreme Court in Marsh specifically rejected the "reasonableness" standard used by the Ninth Circuit Court of Appeals and adopted the "arbitrary and capricious" standard. In explaining its choice, the Court stated:

9

The question presented for review in this case is a classic example of a factual dispute the resolution of which implicates substantial agency expertise. ... Because analysis of the relevant documents "requires a high level of technical expertise," we must defer to "the informed discretion of the responsible federal agencies." [citations]

The Department in this case was carrying out its statutorily-imposed fiduciary duty to "secure the largest measure of legitimate and reasonable advantage to the state" in managing school trust lands. Section 77-1-202, MCA. The Department also had to carry out duties imposed by MEPA, pursuant to which it prepared a PER in order to gather information for its decision on whether to prepare an EIS for Cenex's proposed action. This decision necessarily involved expertise not possessed by courts and is part of a duty assigned to the Department, not the courts. In light of this, and the cases cited above, we hold that the standard of review to be applied by the trial court and this Court is whether the record establishes that the agency acted arbitrarily, capriciously, or unlawfully.

## II.

When applying the above standard of review to this case, it is important to keep in mind which Department action is challenged by North Fork: the approval of Cenex' Annual Operating Plan, which calls for the drilling of an exploratory well. North Fork has contended, and the District Court has held, that this action should not have been undertaken without prior preparation of an EIS. It is apparent from our review of the record, however, that the arguments of counsel and the District Court's Memorandum and Order have strayed from the issue of the operating plan to consider policies and

10

activities that are not at issue here. This is a primary reason for our reversal of the District Court's judgment.

## A. The Department's Decision Was Not Unlawful.

While the standard of review we have adopted utilizes three terms, it breaks down into two basic parts. One part concerns whether the agency action could be held unlawful, and the other concerns whether it could be held arbitrary or capricious. See Langen, 234 P.2d at 471. We will first address the "unlawful" portion. The Department is both empowered and constrained by a set of statutes and regulations relevant to its actions challenged in this case. One such statute is § 77-1-202, MCA, cited above, which imposes a fiduciary duty on the Department to manage the land at issue to the advantage of the State. The procedures followed by the Department in its dealings with Cenex were governed in part by MEPA (§§ 75-1-101, et seq., MCA) and administrative rules enacted pursuant to MEPA (ARM 26.2.602, et seq. repealed 11/1/89; recodified at ARM 26.2.642, et seq.).

North Fork's complaint in the District Court alleged in large part that the Department failed to carry out its appointed duties under these provisions. In the brief filed in support of its motion for summary judgment, North Fork made three arguments:

> 1. [The Department's] decision to forego an EIS at the stage of drilling an oil well was clearly unreasonable and wrong. Conner v. Burford, 605 F.Supp. 107 (D. Mont. 1985) and Kadillak v. Anaconda Co. (1979), 184 Mont. 127, 602 P.2d 147.
> 2. The case is clearly one where the decision "may significantly affect" endangered species and a fragile environment, requiring an EIS under ARM 26.2.603(3)(a).
> 3. [The Department] omitted to perform an evaluation of cumulative impacts, in violation of ARM 26.2.604(1)(b) and (c).

Two of these arguments, the first and third, are directly relevant to the "unlawful" portion of our standard of review.

The District Court's Reliance on Conner v. Burford. The District Court agreed with North Fork's first argument, and relied on Conner v. Burford, supra, to hold the Department's 1976 EIS, 1983 PER and 1984 PER to be insufficient. At the outset, the court adopted North Fork's broad view of the development of oil and gas in the Coal Creek area, and concluded that full-field development required the preparation of an EIS. The Department had argued that its 1976 EIS was sufficient for this purpose. The court found, however, that the 1976 EIS was insufficient because it focused only on Coal Creek lease tracts and did not address the overall impacts of such development. Without a valid EIS, the two PER's became "falling dominos," their environmentally protective stipulations mere examples of the kind of "piecemeal" approach to environmental review held improper in Conner. We disagree.

First, the Department's 1976 EIS has no relevance to this case. The overall impacts of full-field oil and gas development in the Coal Creek State Forest are not at issue. Section 75-1-201, MCA, (entitled "General Directions--Environmental Impact Statements") sets out guidelines for "every recommendation or report on proposals for projects." ARM 26.2.603 ("Determination of Necessity for Environmental Impact Statement") governs consideration of a "proposed action". The proposed project/action under consideration in this case is the drilling of one exploratory well on one lease tract. In considering this proposed action, the Department prepared a site-specific PER in 1984, which supplemented a more general PER prepared in 1983. The conclusion reached by the Department was that an EIS was not required for the single Cenex test well. This is the decision under review.

12

Second, while the District Court was correct in asserting that "[i]f found rich in oil and gas the acreage in question would be under tremendous pressure for further exploration and development," it was premature in concluding that an EIS was required. The court's conclusion apparently resulted from a misreading of the Conner case. The decision of the U.S. District Court for the District of Montana in Conner, cited by North Fork in its brief below, dealt with the question of when an agency action would "significantly affect" the environment, thus requiring preparation of an EIS. This is the same standard employed in § 75-1-201, MCA, and its attendant regulations. The Federal District Court held that issuance of a lease permitting oil and gas development was "the first stage of a number of successive steps" leading to development, and therefore met the "significantly affect" standard. The court feared that proceeding with a piecemeal environmental review by considering only one step at a time would ignore the cumulative effects of development and risk unforeseen, irreversible impacts.

When reviewing the decision, however, the Ninth Circuit Court of Appeals made an important distinction. The appellate court reviewed case law determining that under the "significantly affect" standard, an EIS was always required at the "go/no go" point of oil and gas development. The test derived to pinpoint when the "go/no go" point is reached looks for the proposed action that will entail an "irretrievable commitment of resources". Some of the leases at issue in Conner had "no surface occupancy" (NSO) clauses. Under these clauses, no activity which would disturb the ground in any way could be undertaken without prior approval from the agency involved. The Ninth Circuit Court held that leases with NSO clauses were not an irretrievable commitment of resources. Nothing could happen under the leases without

13

government approval. The point had not been reached where preparation of an EIS was "automatic." The court also noted, "We cannot assume that government agencies will not comply with their NEPA obligations in later stages of development." Conner, 836 F.2d at 1528.

Cenex will operate under essentially the same type of strictures found in the Conner NSO leases. The lease at issue in this case was executed on a printed "Montana Oil and Gas Lease" form supplemented in blank spaces with information specific to the lease arrangement between the Department and Cenex for this well site. North Fork has made much of the printed language in the initial portion of the lease indicating that Cenex thereby acquires the right to do the following:

> ... mining and operating for oil and gas, and of laying pipelines, building tanks, power stations, and other structures thereon necessary in order to produce, save, care for, dispose of and remove the oil and gas ...

According to North Fork, it is hard to imagine these activities not significantly affecting the human environment of the Coal Creek area.

North Fork is correct in that the lease could ultimately empower Cenex to conduct all of the listed activities, and it is easy to imagine these activities having a significant effect on the environment. However, the lease also contains specific environmental stipulations typed into to the lease form under paragraph 26, entitled "Special Provisions". One of these typed stipulations reads:

> If the lessee [Cenex] intends to conduct any activities on the leased premises, it shall submit to the Department of State Lands two copies of an Annual Operating Plan or Amendment to an existing Operating Plan, describing its proposed activities for the coming year. No activities shall occur on

14

> the tract until an Annual Operating Plan or
> Amendments have been approved in writing by the
> Commissioner of State Lands or his designated
> representative.

(Emphasis supplied.) It is a fundamental principle of contract law that written or typewritten provisions in a contract take precedence over printed provisions. Hoerner Waldorf Corp. v. Bumstead-Woolford Co. (1972), 158 Mont. 472, 494 P.2d 293. The typed "special provision" therefore takes precedence over the printed authorization in this lease. Cenex can carry out the listed activities only with prior written approval of the Department. The issuance of this lease was thus not an "irretrievable commitment of resources" as the term was used in Conner. The District Court was incorrect in concluding that full development of oil and gas in the Coal Creek State Forest was a matter of successive steps set into irreversible motion by the issuance of the lease. Like the Ninth Circuit in Conner, this Court cannot assume that the Department will not comply with its MEPA obligations if development proceeds beyond this stage.

The 1983 PER. The District Court's misapplication of the Conner decision also tainted its holdings that the 1983 and 1984 PER's were insufficient. Because the 1984 PER is a "supplement" to the 1983 PER, the court's holdings on both documents are relevant. The court held the 1983 PER inadequate because it relied on the inclusion of environmentally protective stipulations to support its finding that issuing leases would not significantly affect the human environment. The District Court held this approach insufficient for two reasons: (1) it represented piecemealing prohibited by Conner and (2) it should have been a "programatic" review as required by ARM 26.2.614.

15

Our discussion of Conner has shown that a lease issued pursuant to the 1983 PER need not be violative of the ruling in Conner, and the lease involved here in fact was not. As to ARM 26.2.614, the court engaged in selective reading of this rule, which has resulted in misinterpretation. The court and North Fork have at several points focused on portions of relevant provisions utilizing the words "shall" or "must" to conclude that the Department failed to carry out mandatory procedures. However, a cursory examination of ARM 26.2.614 reveals that the procedures listed are subject to a very prominent "if":

> (1) If the department is contemplating a series of agency-initiated actions [which] will constitute a major state action significantly affecting the human environment, the department may prepare a programmatic review ...

(Emphasis supplied.) Again, our discussion above shows that the contemplated action at issue in the 1983 PER was the issuance of leases, which the Department determined did not constitute state actions significantly affecting the human environment. That decision was not challenged by North Fork, so no programmatic review was required.

The 1984 PER. The District Court adopted North Fork's third argument in holding the 1984 PER to be insufficient. North Fork asserted that under ARM 26.2.604, an evaluation of the cumulative impacts of the proposed action was mandatory. The District Court found the 1984 PER insufficient because of its failure to address cumulative impacts.

The term "cumulative impacts" is defined in ARM 26.2.602(1). The rule states that analysis of cumulative impacts under this definition involves consideration of past and present actions related to the proposed action. The proposed action under consideration in the 1984 PER was the

16

drilling of the test well, the first such well in the Coal Creek area. The only past related action was the issuance of leases to Cenex, which was the subject of the 1983 PER. The 1983 and 1984 PER's fulfill the requirement of ARM 26.2.604 in that they examine the impacts of issuing leases and drilling a single test well, the only related proposed actions before the Department.

The arguments advanced by North Fork and the District Court's Memorandum attack the 1984 PER for failing to consider the cumulative impacts of related future actions, namely the full-field development of oil and gas. However, ARM 26.2.604 requires consideration of related future actions only when they are under current consideration. As we stated above, full-field development was not a proposed action before the Department. It was not included in Cenex's Annual Operating Plan, and therefore was not under "current consideration".

In sum, the arguments advanced by North Fork and the rationale provided by the District Court failed to show that the Department acted "unlawfully" in determining that approval of Cenex' first annual operating plan did not require an EIS. Our review of the record has not uncovered any statute or regulation violated by the Department in its dealings with Cenex thus far. The Department has followed required procedures and included in its PER's the information required by statute and administrative rules. Nor can the decision on the Cenex test well be analogized to the situation in Conner. Even under the Conner criteria, the Department made its decision to forego an EIS at a point in the process where that decision was still left to the Department's discretion. We therefore proceed to examine the Department's decision under the "arbitrary or capricious" portion of our standard of review.

## B. The Department's Decision Was Not Arbitrary Or Capricious.

North Fork's second argument in its brief in support of its motion for summary judgment addressed the 1984 PER, and is relevant to this portion of our review. North Fork asserted that by the Department's own analysis, the approval of the well was an action significantly affecting the human environment. North Fork is critical of the Department's treatment of the effects the well might have on bald eagles, grizzly bears or grey wolves thought to inhabit or at least frequent the Coal Creek area. North Fork notes that the Department employs no eagle biologist or wolf biologist, and no wildlife biologist is included in the list of PER preparers. However, North Fork's brief states,

> The issue here is not the questionable quality of the [eagle, bear and wolf] biology in the PER. The issue is whether there is a "may affect" situation . . .

According to North Fork, such a situation "clearly" exists, and an EIS should have been prepared prior to approval of the Cenex Annual Operating Plan.

For each of North Fork's contentions, it quotes a portion of the 1984 PER discussing possible impacts of the well on that animal. North Fork does not contend that required analyses are missing, nor does it focus on the adequacy of the analyses given. North Fork simply contends that the impacts discussed are evidence themselves that the well may significantly affect these facets of the human environment. Its criticism of the lack of wildlife biologists in the list of preparers appears aimed at showing that the Department did not recognize the import of even the "questionable analysis" found in the PER. According to North Fork, the Department was therefore incorrect in deciding that drilling a test well

would not significantly affect the human environment, and its decision ran afoul of the "unreasonable" standard of review.

Our analysis will be similar to that employed by North Fork, except for the actual standard of review applied. This Court has not had the opportunity to review an administrative decision under MEPA utilizing the "arbitrary or capricious" standard. In the Marsh case, however, the U.S. Supreme Court stated a method for conducting such a review:

> As we observed in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971), in making the factual inquiry concerning whether an agency decision was "arbitrary or capricious," the reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." This inquiry must "be searching and careful," but "the ultimate standard of review is a narrow one."

Marsh, 57 LW at 4509. It is also worth noting that our decisions in cases decided under MAPA (see, e.g., Thornton v. Comm'r of the Dep't of Labor and Indus. (1981), 190 Mont. 442, 621 P.2d 1062; Wilderness Association, 648 P.2d at 740) have recognized the limited scope of review in administrative cases. We cannot substitute our judgment for that of the Department by determining whether its decision was "correct." Instead, we must examine the Department's decision to see whether the information set out in the PER's was considered, or the decision to forego an EIS was so at odds with that information that it could be characterized as arbitrary or the product of caprice.

We will read the 1983 and 1984 PER's together, because as noted above, the 1984 PER was intended to supplement the 1983 PER. In these documents, the Department had before it analyses of the possible impacts of drilling the test well that raised a number of environmental concerns. There were

19

questions about maintaining the purity of the water in the North Fork of the Flathead River and a nearby glacial lake. There were questions about how the sight of the drilling rig, the noise it produced while working and the smells associated with its presence would affect endangered species such as bald eagles that nested at the glacial lake, grizzly bears that were thought to use the Coal Creek drainage as a travel corridor to find food, and grey wolves which were slowly being reintroduced to the area. There were also questions about how these same sights, sounds and smells would affect activities such as camping, river floating and hiking along the river and in Glacier Park. The 1983 PER consumed 39 pages in addressing these and other questions, while in the 1984 PER the analyses required 75 pages.

In the process of preparing the two PER's, the Department consulted with over 30 departments and organizations, including the Environmental Protection Agency, the Border Grizzly Project and Wolf Ecology Project at the University of Montana School of Forestry, the Rocky Mountain Oil and Gas Association, and Glacier National Park. The Department also utilized over 60 published studies and other references. During public comment on the 1984 PER, the Department received 70 letters from concerned groups and individuals. Clearly, there were many concerns expressed and much information provided.

In response to this process, the Department decided to include measures to mitigate the impact of oil and gas activities in the form of stipulations to Cenex's lease and to the written approval of Cenex's operating plan. The Department has argued that these stipulations prevented its approval of the operating plan from rising to the level of a state action significantly affecting the human environment. At the federal level, the Ninth Circuit Court of Appeals has held that

20

such "mitigation measures" are to be considered in reviewing a decision to forego an EIS, and if the measures are "significant", they may justify such a decision under the "unreasonable" standard. Friends of Endangered Species, Inc. v. Jantzen (9th Cir. 1985), 760 F.2d 976, 987. Given the narrower, "arbitrary or capricious" standard being applied in this case, sufficiently significant mitigation measures certainly would justify the Department's decision.

The mitigation measures adopted by the Department have taken the form of a total of 42 protective stipulations, 11 attached to the lease and 31 attached to the approval of the operating plan. They include such measures as forbidding any activity on the lease tract during times of the year important to bald eagle nesting and grizzly bear migration. The drilling rig must be painted a color that will not stand out against the natural background, additional mufflers must be installed on the diesel engines used to power the rig, and the engines must be mounted facing a certain direction to reduce the noise reaching bald eagle nests and Glacier Park. Five stipulations deal with any necessary disturbance of the soil and its replacement. Eight stipulations concern maintaining the quality of the ground water, and include restrictions on the chemical content of drilling fluids and the size of trucks that may be used to haul diesel fuel to the rig. The stipulations also address the workers on the rig, imposing regulations on garbage disposal and forbidding the presence of personal pets, among other measures.

We have reviewed the concerns raised by the preparers of the PER's, as well as those raised by agencies consulted and members of the public. We have also reviewed the mitigation measures imposed by the Department. We conclude that the Department has considered the concerns raised and taken significant steps to address them. We therefore hold that

21

the Department's decision to approve Cenex's annual operating plan was not arbitrary, nor was it an exercise of caprice. Having also held that the Department did not act illegally, we therefore uphold the Department's decision and reverse the District Court on this question.

### III.

One of the remedies afforded by the District Court was a writ of mandate requiring the Department to prepare an EIS. We have held above that an EIS was not required in this case, which makes the issuance of the writ erroneous. We feel compelled to add, however, that mandamus was an inappropriate remedy in this case. As our discussion above has brought out, the Department's decision to forego an EIS at this stage of development was necessarily an exercise of discretion to which courts must give a measure of deference. In fact, we have previously held that the Department must exercise its discretion in all phases of its management of state lands.

> "If the 'large measure of legitimate and reasonable advantage' from the use of state land is to accrue to the state, then the [Department] must, necessarily, have a large discretionary power. Every facet of the [Department's] action cannot, and is not, explicitly laid out in the statutes of the State Constitution."

Jeppeson v. State (1983), 205 Mont. 282, 289, 667 P.2d 428, 431 (quoting Thompson v. Babcock (1966), 147 Mont. 46, 409 P.2d 808). We held in Jeppeson that mandamus is not available to compel a discretionary act. We therefore reverse the District Court on this question.

We have held that the District Court applied the incorrect standard of review in this case, and that under the correct standard, the Department's approval of Cenex's annual operating plan was proper. We have further held that mandamus was not available in this case. We therefore reverse the

22

decision of the District Court, dissolve the writ of mandate issued by the court, and remand this case for entry of judgment in favor of the Department.

_R. C. McDonough_
Justice

We Concur:

_J. A. Turnage_
Chief Justice

_John Conway Harrison_

_L. C. Gulbrandson_

Justices

_Peter L. Rapkoch_
District Judge Peter L. Rapkoch
sitting for Justice John C. Sheehy

23

Justice William E. Hunt, Sr., dissenting.

I dissent. The District Court's summary judgment in favor of North Fork should be affirmed.

The majority concludes that an oil well drilled in the Coal Creek State Forest, located on the North Fork of the Flathead River, will not generate such a "significant impact upon the human environment" as to require the preparation of an Environmental Impact Statement (EIS). The lease in question, however, not only gives Cenex the right to drill for oil and gas, it also empowers the corporation to engage in other activities associated with oil and gas development-- laying pipelines, building tanks, constructing power stations and other necessary structures. Should this one exploratory well produce oil or gas, Cenex will definitely undertake these activities--activities that will significantly affect the human environment.

Taking comfort in the lease's seemingly restrictive provisions that require Cenex to submit annually an operating plan for written approval by the Department before Cenex undertakes any additional developmental activity, the majority incorrectly concludes that the only issue involved in this case is the impact of this one well. Much more than one, site-specific well is at stake here. This well is merely the first step toward the full development of oil and gas in the Coal Creek State Forest. Should Cenex discover gas or oil with this one well, as is highly probable, the economic pressure for full-field oil and gas development of the area will be tremendous. For the majority to believe that such development is not at issue is incomprehensible.

The majority states that an EIS will not be required until Cenex has made an "irretrievable commitment of resources." An irretrievable commitment of resources occurs at the "go/no go" point of oil and gas development. With the

Department's approval of Cenex's proposal to drill one exploratory well, we have reached this "go/no go" point. The drilling of one oil well on Coal Creek land constitutes a disturbance of the ground and, definitionally, an irretrievable commitment of resources. An EIS must be undertaken before the Department approves an annual operating plan that includes a proposal to drill--whether the proposal is for one well or twenty.

The immediate and long-term effects that drilling in the Coal Creek State Forest will have on the human and physical environment are potentially devastating. Yet, by choosing to review the need for an EIS under the most lenient of all standards of review--the arbitrary, capricious and unlawful standard--the majority appears content to let the future of our forests, rivers, wildlife and wilderness rest in the hands of non-elected public officials. When I see the Department giving priority to the raising of revenue over the quality of our environment, I cannot share the majority's assurance that the Department is adequately carrying out its fiduciary duty to "secure the largest measure of legitimate and reasonable advantage to the state" in managing school trust lands.

The core of Montana's value derives from its natural beauty. The area involved, teeming with wildlife, includes the gateway to Glacier National Park, the Coal Creek State Forest and the North Fork of the Flathead River, which not only comprises part of the Wild and Scenic River System but also feeds the majestic Flathead Lake. The majority and the Department may be willing to exploit these state treasures without taking a hard look at the future. I, for one, cannot condone the Department's hasty and ill-considered decision to allow drilling prior to the compilation of an EIS.

I would affirm the District Court.

Justice