No. 96-668

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997


SKYLINE SPORTSMEN'S ASSOCIATION,
ANACONDA SPORTSMEN'S CLUB,
MONTANA ACTION FOR ACCESS ASSOCIA-
TION, and COALITION FOR APPROPRIATE
MANAGEMENT OF STATE LANDS,

Plaintiffs and Appellants,

v.

BOARD OF LAND COMMISSIONERS;
DEPARTMENT OF NATURAL RESOURCES
AND CONSERVATION; and GOVERNOR MARC
RACICOT; JOSEPH P. MAZUREK, ATTORNEY
GENERAL; MIKE COONEY, SECRETARY OF
STATE; NANCY KEENAN, SUPERINTENDENT
OF PUBLIC INSTRUCTION; and MARK O'KEEFE,
STATE AUDITOR; in their capacities as Members
of the State Land Board,

Defendants and Respondents.
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
MONTANANS FOR THE RESPONSIBLE
USE OF THE SCHOOL TRUST,

Intervenors,

v.

SKYLINE SPORTSMEN'S ASSOCIATION, et al.,
and BOARD OF LAND COMMISSIONERS, et al.,

Defendants in Intervention.



APPEAL FROM:     District Court of the First Judicial District,
In and for the County of Lewis and Clark,
Honorable John Thomas C. Honzel, Presiding.



COUNSEL OF RECORD:

For Appellant:

Brian M. Morris (argued), Goetz, Madden & Dunn, Bozeman, Montana

For Respondent:

Tommy Butler (argued)  and Richard E. Bach, Special Assistant
Attorneys General, Helena, Montana

Roy H. Andes (Intervenor) (argued),  Missoula, Montana

Heard and Submitted: October 21, 1997

Decided: December 15, 1997
Filed:

_____
Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

The District Court for the First Judicial District, Lewis and Clark County, granted
Defendants' motion for summary judgment and denied Plaintiffs' request for a
preliminary injunction, dismissing a challenge to a proposed land exchange between the
Board of Land Commissioners and Turner Enterprises, Inc.  We vacate and remand.
The dispositive issue is whether the District Court erred by granting summary
judgment because Plaintiffs raised genuine issues of material fact.

Background

The Board of Land Commissioners (Board) is one of a handful of boards
established by the Montana Constitution.  The Board has direct constitutional authority
to lease, exchange, and sell state trust lands.

The governor, superintendent of public instruction, auditor, secretary
of state, and attorney general constitute the board of land commissioners.
It has the authority to direct, control, lease, exchange, and sell school lands
and lands which have been or may be granted for the support and benefit
of the various state educational institutions, under such regulations and
restrictions as may be provided by law.

Article X, Section 4, Mont. Const.  In addition, Article X, Section 11(4), Mont. Const.,
provides:

All public land shall be classified by the board of land commissioners in a manner provided by law. Any public land may be exchanged for other land, public or private, which is equal in value and, as closely as possible, equal in area.

Section 77-1-202(1), MCA, echoes the constitutional authority of the Board. It states:

The board shall exercise general authority, direction, and control over the care, management, and disposition of state lands and, subject to the investment authority of the board of investments, the funds arising from the leasing, use, sale, and disposition of those lands or otherwise coming under its administration. In the exercise of these powers, the guiding principle is that these lands and funds are held in trust for the support of education and for the attainment of other worthy objects helpful to the well-being of the people of this state as provided in The Enabling Act. The board shall administer this trust to secure the largest measure of legitimate and reasonable advantage to the state.

In 1993, Turner Enterprises, Inc. (Turner), submitted a proposal to the Board to exchange state school trust land located within the boundaries of Turner's Flying D Ranch southwest of Bozeman, Montana, for private land Turner owned elsewhere in Montana. The original proposal was to exchange 7,486 acres of state land within the Flying D Ranch for 12,689 acres of land Turner owned within the Snowcrest Ranch south of Alder, Montana, and the Ulm Pishkun southwest of Great Falls, Montana. The Department of Natural Resources and Conservation (Department) reviewed the proposal and recommended that it be rejected as not assuring a "good deal" for the State when all attributes of the state lands were evaluated against the land proposed for state acquisition.

Turner then modified its proposal by deleting from the proposed exchange two sections of state lands within the Flying D Ranch. As modified, the proposal was to exchange 6,167 acres of state land for 12,689 acres of private land. On April 15, 1996, after review by the Department, solicitation of public comment, and preparation of an environmental assessment (EA) as required under the Montana Environmental Policy Act, õõ 75-1-101 through -324, MCA, the Board approved the modified proposal.

The plaintiff organizations of recreationists and sportsmen brought this declaratory judgment action arguing that the Board had overstepped its lawful discretion under the Montana Constitution because it did not exchange the state land "under such regulations and restrictions as may be provided by law." Article X, Section 4, Mont. Const. Specifically, Plaintiffs argued that the Board did not comply with õ 77-2-203(2), MCA:

If the requirements of subsection (1) and 77-2-204 are met, state lands bordering on navigable lakes and streams or other bodies of water with significant public use value may be exchanged for private land if the private land borders on similar navigable lakes, streams, or other bodies of water.

The two most significant bodies of water on the private land owned by Turner are Ledford Creek and Robb Creek, both of which are located on the Snowcrest Ranch. Cherry Creek and Spanish Creek are the two most significant bodies of water on the state land proposed for exchange. Plaintiffs argued that while Cherry Creek and Spanish Creek are streams with significant public use value, Ledford Creek and Robb Creek are not.

The Plaintiffs pointed out that throughout the process of approving the land exchange, the Board told them that õ 77-2-203(2), MCA, did not apply because "there are no state lands bordering on a navigable lake or stream included in this proposed exchange." Only on June 17, 1996, after Plaintiffs had filed this action, did the Board make supplementary findings on õ 77-2-203(2), MCA, including a finding that Robb Creek and Ledford Creek have "the potential to provide significant public use value."

MonTRUST, a non-profit citizens' organization promoting the protection, advancement and appropriate use of Montana's school trust lands on behalf of public education, was granted leave to intervene before the District Court. The Defendants moved to dismiss the action or, in the alterative, for summary judgment. Intervenors moved for summary judgment as well, while Plaintiffs moved for a preliminary injunction to prevent the exchange from proceeding during the pendency of this lawsuit. At a hearing on all of the pending motions, the attorneys for the parties and for the Intervenors made oral argument. Additionally, Plaintiffs presented testimony of five witnesses concerning the comparability of the bodies of water on the lands proposed for exchange.

In a memorandum and order entered after the hearing, the court found that the Plaintiffs had standing to bring this action but that the Board had adequately considered the requirements set forth at õ 77-2-203(2), MCA. Accordingly, the court granted the Defendants' motion for summary judgment and denied the Plaintiffs' motion for a preliminary injunction.

## Discussion

Did the District Court err by granting summary judgment because Plaintiffs raised genuine issues of material fact?

Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), M.R.Civ.P. This Court's standard of review of a summary judgment is the same standard as that employed by the district court--whether there are genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Missoula Rural Fire Dist. v. City of Missoula (Mont. 1997), 938 P.2d 1328, 1329, 54 St.Rep. 480, 481.

The standard of review of an informal administrative decision is whether the decision was arbitrary, capricious, or unlawful. North Fork Pres. v. Dept. of State Lands (1989), 238 Mont. 451, 458-59, 778 P.2d 862, 867. It was appropriate for the District Court, in applying that standard, to accept new evidence and not to limit its

review to the administrative record. In a proceeding to determine whether an agency decision was arbitrary, capricious, or unlawful, unless the reviewing court looks beyond the record to determine what matters the agency should have considered, it is impossible for the court to determine whether the agency took into consideration all relevant factors in reaching its decision. ASARCO, Inc. v. U.S.E.P.A. (9th Cir. 1980), 616 F.2d 1153, 1160.

Combining the two applicable standards of review, the question before the District Court and this Court is whether the Plaintiffs have established a genuine issue of material fact as to whether the Board's decision was arbitrary, capricious, or unlawful.

In their brief and at oral argument, the Defendants pointed out that under Montana's stream access law at õ 23-2-302(1), MCA, the effect of the proposed land exchange on the availability of Cherry Creek and Spanish Creek to recreationists will merely be fewer points of access; recreationists will retain the right to use the creeks. A condition to the exchange would be that public access to the creeks would be maintained at legal access points. The Defendants also point out the "world-class hunting opportunities" on the Snowcrest Ranch, now privately-owned, but which would become state land. The Defendants explain that a multitude of factors entered into the evaluation of whether the exchange serves the interests of the school trust beneficiaries and provides recreational opportunities for the public.

Similarly, the Intervenors argue that the Board's fiduciary duty to the trust beneficiaries mandates approval of this proposed land exchange because the exchange will result in greater income to the beneficiaries, which the Intervenors argue is the only purpose of the trust. As a result of the exchange, the trust corpus would gain $217,438 in value plus a projected additional $6,577 in annual income from hunting fees and agricultural and grazing leases.

However, neither the Board's fiduciary duty to the trust beneficiaries nor the other factors which entered into its decision on this proposed land exchange relieves the Board of its constitutional obligation to follow the "regulations and restrictions" imposed by the Legislature on proposed land exchanges, including those found in õ 77-2-203(2), MCA. We must presume that the Montana Legislature understood the effect of its action in passing õ 77-2-203(2), MCA, a "regulation and restriction" which may constrict the Board's discretion in managing state trust land. See Rider v. Cooney (1933), 94 Mont. 295, 310, 23 P.2d 261, 264 ("[t]he legislature is presumed to act, so far as mere questions of policy are concerned, with full knowledge of the facts upon which its legislation is based, and its conclusions on matters of policy are beyond judicial consideration"). The Board cannot ignore the requirements set forth at õ 77-2-203

(2),
MCA, simply because it believes that it otherwise received a "good deal" from the proposed exchange.

The Board based its finding that Robb Creek and Ledford Creek have "the potential to provide significant public use value" on the following factors:

(a)  The exchange would result in additional mileage of stream ownership than currently owned by the State;

(b) These creeks can provide good sport fisheries to the public; and

(c)  Robb Creek contains a highly pure strain of native cutthroat trout which is largely absent in either Cherry Creek or Spanish Creek.

As a  preliminary matter, we note that § 77-2-203(2), MCA, refers to "significant public use value," not potential for significant public use value.

The statement that Robb Creek and Ledford Creek had the potential to provide significant public use value was buttressed first by the Board's finding that the lands to be received in the proposed exchange had more miles of streams.  Additional stream mileage alone does not equate to significant public use value.

The Plaintiffs point out that the EA of Robb Creek and Ledford Creek indicated high levels of erosion and siltation, low fish numbers, and almost no public use.  The EA discussed electroshock surveys undertaken by the Department of Fish, Wildlife & Parks (DFWP).  According to the DFWP's 1991 electroshock survey, Ledford Creek contained approximately ten brown trout and five rainbow trout for every 1,000 feet of stream and Robb Creek contained thirty-seven brook trout and five westslope cutthroat trout per 1,000 feet of stream.  In contrast, an electroshock survey undertaken on upper Cherry Creek showed 237 rainbow trout and twenty-five brown trout; and on lower Cherry Creek, 164 brown trout, 128 rainbow trout, and twenty-six mountain whitefish per 1,000 feet of stream.

Further, while the EA asserted that Robb Creek and Ledford Creek were important spawning areas for fish living in the Ruby River, the Plaintiffs presented contrary testimony at the District Court hearing.  The two DFWP fisheries biologists upon whose study this assertion in the EA was based, Messrs. Brammer and Oswald, testified that their studies did not cover Ledford Creek and Robb Creek but had focused instead on areas of the Ruby River upstream.  Brammer, to whom the EA attributed a statement that these creeks were important spawning areas, stated that he could not agree with the statement attributed to him "because I don't have any evidence that would suggest that's the case."  Oswald testified that he did not find any evidence of spawning from Ruby River into Robb Creek and that any claim that Ledford Creek and Robb Creek are important spawning areas "could not be supported by the current evidence that we have."

The EA described Ledford Creek as "a good sport fishery with management potential."  However, both Brammer and Oswald testified before the District Court that

significant problems, including sedimentation, may prevent the development of Robb Creek and Ledford Creek as sport fisheries. Furthermore, Oswald testified that DFWP had absolutely no evidence from field reports or otherwise of anyone fishing in Robb Creek or Ledford Creek.

The Plaintiffs presented several witnesses who testified that Spanish Creek and Cherry Creek are excellent sport fisheries but that Robb and Ledford Creeks are not. Among others, William Fairhurst, a retired military pilot and avid outdoorsman, stated by affidavit that both Spanish Creek and Cherry Creek are "pristine blue ribbon trout streams with as good of fishing as can be found in the state." He stated that, in contrast, "Ledford Creek and Robb Creek contain insignificant water flow compared to Spanish Creek and Cherry Creek, and, in fact, they are not reliable for fishing and water throughout the year."

The Board's supplemental findings further stated that Robb Creek contains a highly pure strain of westslope cutthroat trout largely absent in either Cherry Creek or Spanish Creek. The Plaintiffs presented evidence to the District Court on this point as well. Brammer testified that a recovery program for westslope cutthroat trout in Robb Creek would be speculative because of habitat degradation and a relatively higher density of the competi- tive brook trout. DFWP had no management plan in place for developing the westslope cutthroat trout population in Robb Creek, and none was proposed at the time of the hearing.

Additionally, at the hearing before the District Court, the Plaintiffs' witnesses raised valid questions about the extent to which access to Cherry Creek and Spanish Creek would be available to the public under the stream access law. All of the above factual issues must be viewed against the backdrop of a Board which maintained during its decisionmaking process that õ 77-2-203(2), MCA, did not apply to this proposed exchange, but when faced with this lawsuit abruptly changed its position and belatedly adopted findings relating to significant public use of the waters involved.

We conclude that Plaintiffs should be accorded an opportunity through full discovery to explore the factual basis, or lack thereof, for the Board's finding that Robb Creek and Ledford Creek constitute bodies of water with significant public use values. The Plaintiffs have raised genuine issues of material fact as to whether Robb Creek and Ledford Creek are streams with significant public use value, including: whether a "potential to" provide significant public use value is equivalent to providing significant public use value; the weight, if any, to be accorded an increase in stream mileage under state ownership as a result of the land exchange; the significance of the Robb Creek westslope cutthroat trout population in light of the other facts and circumstances; and the truth of the claim in the EA that Ledford Creek can provide a good sport fishery to the

public.  Because of these issues of fact, we hold that a material issue of fact exists as to whether the Board's decision approving the proposed land exchange was arbitrary, capricious, and unlawful.  Summary judgment was therefore improper.

Having determined that the District Court erred in granting summary judgment for the Board, we need not reach the other issues raised on appeal.  We vacate the summary judgment and remand to District Court for further proceedings consistent with this Opinion.

/S/  J. A.  TURNAGE


We concur:

/S/  WILLIAM E. HUNT, SR.
/S/  JAMES C. NELSON
/S/  JIM REGNIER
/S/  TERRY N. TRIEWEILER


Honorable Marc G. Buyske, District Judge, specially concurring.

I concur in the result of the majority opinion, but not in all that is stated in that opinion.  I believe the path the majority chose to take to that result runs too broadly through a factual analysis and invites future litigants to view district court proceedings as a means to do what should have been done at the administrative agency level--develop the record.  I would hold the District Court erred as a matter of law in concluding, in effect, the decision of the Board of Land Commissioners approving the land exchange at issue here was not arbitrary.

Although the matter was put before the District Court via a motion for summary judgment, the District Court chose to consider and rule on the matter as a judicial review of the administrative decision of the Board.  The District Court could not make factual findings as those would be beyond the purview of that proceeding, hence its decision to uphold the decision of the Board is one of law.  This Courtþs review of legal decisions is plenary as no exercise of  discretion is necessary to those decisions--the legal conclusion is either correct or not.  Hicklin v. CSC Logic, Inc. (Mont. 1997), 940 P.2d 447, 449, 54 St.Rep. 675, 676; Erickson v. State ex rel. Bd. of Medical Examiners (Mont. 1997), 938 P.2d 625, 628, 54 St.Rep. 395, 396.  When conducting its plenary review of a district courtþs review of an informal administrative decision, this Court

follows the same standard as the district court, namely, does the record before the administrative body establish it acted arbitrarily, capriciously, or unlawfully. North Fork Pres. v. Department of State Lands (1989), 238 Mont. 451, 458-59, 778 P.2d 862, 867. The administrative decision is arbitrary and capricious if it was not based upon a consideration of all relevant factors and if there has been a clear error of judgment. Citizens to Preserve Overton Park, Inc. v. Volpe (1971), 401 U.S. 402, 416, 91 S.Ct. 814, 823-24, 28 L.Ed.2d 136, 153.

The authority of the Board of Land Commissioners is established by the Montana Constitution:

The governor, superintendent of public instruction, auditor, secretary of state, and attorney general constitute the board of land commissioners. It has the authority to direct, control, lease, exchange, and sell school lands and lands which have been or may be granted for the support and benefit of the various state educational institutions, under such regulations and restrictions as may be provided by law.

Article X, Section 4, Mont. Const.

Section 77-1-202(1), MCA, echoes the constitutional authority of the Board when it states:

The board shall exercise general authority, direction, and control over the care, management, and disposition of state lands and, subject to the investment authority of  the board of investments, the funds arising from the leasing, use, sale, and disposition of those lands or otherwise coming under its administration.  In the exercise of these powers, the guiding principle is that these lands and funds are held in trust for the support of education and for the attainment of other worthy objects helpful to the well-being of the people of this state as provided in The Enabling Act.  The board shall administer this trust to secure the largest measure of legitimate and reasonable advantage to the state.

A further þregulationþ or þrestrictionþ provided by law with respect to the actions of the Board is enumerated in õ 77-2-203(2), MCA:

If the requirements of subsection (1) and 77-2-204 are met, state lands bordering on navigable lakes and streams or other bodies of water with significant public use value may be exchanged for private land if the private land borders on similar navigable lakes, streams, or other bodies of water.

The record before the District Court and this Court makes clear the Board did not believe the requirements of õ 77-2-203(2), MCA, applied to this proposed land exchange transaction.  Obviously, õ 77-2-203(2), MCA, does apply to this land exchange transaction, and the conclusion of the Board to the contrary is a clear error of legal judgment.  This error necessarily affected the development and consideration of the record upon which the Board based its April 15, 1996, decision to approve the exchange.

The Board could not have considered the elements of õ 77-2-203(2), MCA, when its decision was made as the Board did not understand õ 77-2-203(2), MCA, to apply to the proposed transaction.

Applying the review standards noted above to this situation, I hope I restate the obvious when clarifying that an administrative board must consider relevant factors prior to reaching its decision and not after that decision has been made. In this case it is undisputed that the Board approved the land exchange and then considered the similarity of the significant public use values of the waterways in question. The supplementary adoption of relevant evidence, when that evidence is statutorily required for lawful decision making, is unacceptable.

The Board is entrusted by the public with fiduciary control over Montanaþs public trust land. To disregard a statute governing the maintenance of that trust in reaching a decision affecting the trust corpus, and then to provide after-the-fact-of-the-decision findings to justify compliance with the previously disregarded statute, is a not insignifi-cant breach of the Boardþs obligation to the public. Regardless of the manner in which the supplementary findings were adopted or the validity of facts supplemented to the record, the process is of such unseemly appearance as to be arbitrary as a matter of law.

The statute ignored by the Board in making the decision to approve this land exchange is a direction from the citizens of this State that certain factors need be considered, and certain assurances confirmed, with respect to the exchange of their public trust lands for private lands. The citizens of this State can demand nothing more, and expect nothing less, than to have the governmental entities of the State follow the valid directions of the governed.

The Board has a statutory obligation to make certain, when it trades public lands that contain navigable lakes and streams or other bodies of water with significant public use value, the State of Montana receives lands with similar bodies of water. The Boardþs refusal to consider õ 77-2-203(2), MCA, during its decision making process and its attempt to justify its decision to approve the land exchange with supplementary hearings regarding õ 77-2-203(2), MCA, constitutes an arbitrary failure of this statutory obligation.

I would remand this matter to the District Court for its return to the Board of Land Commissioners with instructions to reconsider its decision regarding this land exchange

and to properly hear and consider evidence as to the significant public use values of the bodies of water upon the lands to be exchanged.

/S/ MARC G. BUYSKE
District Judge, sitting in place
of Justice W. William Leaphart

Justice Karla M. Gray, dissenting.

I respectfully and reluctantly dissent from the Court's opinion. While it is clear that the Board of Land Commissioners and its legal advisers did not cover themselves in glory via their conduct in these proceedings, I cannot join the Court's sweeping effort to reconstitute the administrative record on which the Board made its decision in order to provide the plaintiffs a "second bite at the apple" in their late effort to impact on that record and the ultimate decision in this case. I would affirm the District Court's conclusion that the Board's decision was not arbitrary, capricious or unlawful.

The issue of whether the Board's decision was unlawful is not a difficult one. Late or not, the Board ultimately concluded that õ 77-2-203(2), MCA, applies to this land exchange. When it did so, it made special findings relating to the statutory requirements on the basis of the record before it, provided opportunities for public input and comment on those findings, and ratified its earlier approval of the land exchange on the basis of those findings. Thus, it cannot fairly be said that the Board's decision was unlawful.

Moreover, while I agree with the Court and with Judge Buyske's thoughtful special concurrence that the procedures by which the Board's ratified decision was made were undoubtedly unseemly from the standpoint of the public's rightful expectations of the Board, the question before us is not whether the procedures were arbitrary or capricious. The question is whether the Board's decision was arbitrary or capricious, and I submit that it was not. The District Court concluded, and I agree, that sections 3.2.8 and 4.1.8 of the EA provided a sufficient basis--that is, substantial evidence--to support the Board's findings and conclusions that the land exchange meets the requirements of õ 77-2-203(2), MCA. Beyond that, we cannot properly go in this case.

The Court, however, approaches this case as if it were a direct challenge to the EA, notwithstanding that all parties agree it is not. In its sweeping consideration

and evaluation of the evidence the plaintiffs submitted to the District Court after the EA was long completed, this Court essentially upends the EA process and the right of agencies who must use EAs in decision-making to rely on them. It does so by essentially allowing the plaintiffs--who either sat out the EA process or whose views were not accepted during that process--to make a "new" record relating to matters addressed in the EA, after the fact and absent a legal challenge to the EA or the process by which the EA was developed. If the plaintiffs wanted to impact the EA, they were obliged to do so during that process. Since the evidence presented to the District Court was not offered during that process, it cannot properly be considered now in this indirect attack on the EA via a challenge to the Board's decision.

Moreover, the plaintiffs could have presented the evidence at issue to the Board prior to the Board's conclusion that õ 77-2-203(2), MCA, applied or during the public comment and input opportunities provided on the Board's special findings ratifying and approving the land exchange. They did not do that either. Thus, I cannot agree with the Court's determination that this evidence can now be used to create genuine issues of material fact regarding whether the Board's decision was arbitrary or capricious.

Finally, the Court's approach to the use of late-offered evidence to create genuine issues of material fact regarding whether the Board's decision was arbitrary or capricious essentially allows this Court--or any court--to intrude directly into the decision-making responsibilities of the Board. No matter how the Court couches it, its decision in this case means that every administrative agency decision can be challenged on "arbitrary or capricious" grounds if a mere evidentiary conflict in the record can be raised--or created after the fact--and every such challenge will allow courts to both intrude into agency decision-making and substitute their judgment for that of the agency. Notwithstanding the rumored discontent in many quarters over the extent to which the legislature has delegated authority to administrative agencies, I cannot agree that the Court can properly vest that authority in itself.

I dissent.

/S/ KARLA M. GRAY