Justice Ingrid Gustafson delivered the Opinion of the Court.
***267 ¶1 Plaintiff Upper Missouri Waterkeeper (Waterkeeper) appeals the order of the Eighteenth District Court, Gallatin County, denying Waterkeeper's Motion for Summary Judgment, granting the Cross-Motions for Summary Judgment of the Defendant Montana Department of Environmental Quality (DEQ) and Intervenor-Defendant the City of Billings, and affirming DEQ's decision to issue Montana Pollutant Discharge Elimination System (MPDES) Permit No. MTR040000 (the General Permit). We affirm.
¶2 We restate the issues on appeal as follows:
1. Whether the General Permit complies with public participation requirements?
*795 2. Whether DEQ's decision to incorporate construction and post-construction storm water pollution controls into the General Permit was unlawful, arbitrary, or capricious?
3. Whether DEQ incorporating Total Maximum Daily Loads (TMDLs) into the General Permit was unlawful, arbitrary, or capricious?
4. Whether DEQ's decision to incorporate pollution monitoring requirements into the General Permit was unlawful, arbitrary, or capricious?
FACTUAL AND PROCEDURAL BACKGROUND
¶3 In 1972, Congress enacted the modern version of the Federal Water Pollution Control Act, more commonly known as the Clean Water Act (CWA). The CWA's stated objective is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." The CWA set a goal of eliminating the discharge of pollutants into the navigable waters of the United States by 1985. To make progress towards this goal, Congress established a permitting system known as the National Pollution Discharge Elimination System (NPDES), which is administered by the United States Environmental Protection Agency (EPA).
¶4 The CWA allows for states to administer their own permits, and in 1974 the State of Montana and EPA signed a Memorandum of Agreement (MOA), which transferred the responsibility of issuing NPDES permits within Montana to DEQ.[1] DEQ issues permits under the Montana Pollution Discharge Elimination System (MPDES). EPA continues to review, comment on, and/or make recommendations to DEQ regarding proposed permits. Under the MOA, if EPA does not ***268 object to a proposed permit, its non-objection "shall be considered as concurrence" in the issuing of the permit.
¶5 Because pollution into the nation's waters was not eliminated by 1985, the CWA has been amended in the years since. Following the enactment of the CWA, EPA discovered that a driver of pollution is discharges from municipal separate storm sewer systems (MS4s). The CWA was then amended by Congress in 1987 to add provisions addressing storm water discharges from certain municipalities-and set deadlines for permits regarding MS4s serving populations of 250,000 or more (large MS4s) and those serving populations of more than 100,000 but less than 250,000 (medium MS4s). The 1987 CWA amendments further required EPA, "in consultation with State and local officials," to study and regulate additional storm water discharges as needed to protect water quality. This led to the eventual regulation of certain MS4 systems serving populations of less than 100,000 (small MS4s). MS4 discharge permits may be issued either as an individual permit to a single MS4 or as a general permit to a group of MS4s. Montana has no large or medium MS4s.
¶6 As part of its further regulation of storm water discharges, EPA issued its "Phase I Rule" in 1990, which addressed large and medium MS4s. Nine years later, in 1999, EPA issued its "Phase II Rule" which addressed small MS4s. While all MS4 discharge permits must include terms and conditions to "reduce the discharge of pollutants" from the MS4 to the maximum extent practicable (MEP), small MS4s were able to choose to either be regulated as if they were large or medium MS4s under 40 C.F.R. § 122.26(d) or to include six minimum control measures (MCM) within their storm water management programs (SWMP).[2] The six MCMs constitute narrative effluent limitations requiring the implementation of best management practices (BMPs), which EPA determined to be "generally the most appropriate form of effluent limitations" regarding small MS4s.[3] The six MCMs are: (1) public *796 education and outreach on storm water impacts; (2) public involvement/participation; (3) illicit discharge detection and elimination; (4) construction site storm water runoff control; (5) post-construction storm water management in new development and ***269 redevelopment; and (6) pollution prevention/good housekeeping for municipal operations. EPA further determined that implementation of BMPs consistent with provisions of the SWMP constituted compliance with the standard of reducing pollutants to the "maximum extent practicable." EPA "intentionally" did not provide "a precise definition of MEP to allow maximum flexibility in MS4 permitting."
¶7 DEQ is responsible for administering the provisions of the Montana Water Quality Act (MWQA), one of which is the issuance of MPDES permits. In 2003, the Montana Board of Environmental Review (BER) first adopted rules for the small MS4 MPDES permit program to comply with the requirements of the CWA. In accordance with these rules, small MS4s in Montana include the cities of Billings, Missoula, Great Falls, Bozeman, Butte, Helena, and Kalispell (collectively MS4 cities), portions of Yellowstone, Missoula, and Cascade counties, as well as Malmstrom Air Force Base, Montana State University, and the University of Montana.
¶8 DEQ issued the first five-year MS4 general permit in 2005 and the second in 2010. In 2014, DEQ began working on the third MS4 general permit and convened meetings involving stakeholders, including the MS4 cities. The MS4 cities, as a result of these meetings, proposed that DEQ extend the 2010 general permit for a period of two years while the MS4 cities, DEQ, and other stakeholders formed a storm water working group to develop a new MS4 general permit. DEQ agreed to this arrangement, and issued an MS4 general permit effective from January 1, 2015, to December 31, 2016.
¶9 Beginning in January 2015, the storm water working group convened monthly meetings. The storm water working group included the MS4 cities, DEQ, EPA, representatives from the three MS4 counties, Montana State University, Malmstrom Air Force Base, Waterkeeper, Montana Environmental Information Center (MEIC), and the Clark Fork Coalition. The storm water working group met monthly until April 2016 as DEQ developed the proposed 2017 general permit. On September 19, 2016, DEQ issued a public notice stating its intention to hold a public hearing on the issuance of the 2017 draft permit, and provided information on obtaining a copy of the draft permit, accompanying fact sheet and environmental assessment, and how the public could provide comments regarding the draft permit. DEQ received written public comments from EPA, Waterkeeper, Department of the Air Force, and the MS4 cities of Billings, Great Falls, Kalispell, Helena, Missoula, Butte-Silver Bow, and Bozeman.
¶10 DEQ held a public hearing on the draft permit on October 21, 2016. Testimony was presented by Waterkeeper, the city of Helena, ***270 and the city of Bozeman at the hearing. Waterkeeper testified regarding the changes from the 2015 general permit to the draft permit, stating that the draft permit is "a really good permit," while also noting some areas of the permit needed "tweaks." In written comments, EPA stated that it reviewed the draft permit and provided comments that were "minor in nature," and further "commend[ed] the state on this Permit." EPA did not object to the issuance of the General Permit under its permit review authority.
¶11 On November 30, 2016, DEQ issued the General Permit. EPA did not object to its issuance under its permit review authority, and the General Permit went into effect on January 1, 2017. On December 30, 2016, Waterkeeper sued DEQ in the District Court, alleging that the General Permit was deficient in several respects. The City of Billings, one of the MS4 cities regulated by the General Permit, intervened in the case. Waterkeeper then filed a motion for summary judgment, while DEQ and the City of Billings each filed cross-motions for summary judgment. The District Court held a hearing on the motions on March 13, 2018, at which all parties agreed that no material facts were in dispute and the matter could be determined based upon the arguments of the parties and the administrative record. On June 14, 2018, the District Court denied Waterkeeper's motion, granted DEQ's and the City *797 of Billings' cross-motions, and affirmed DEQ's issuance of the General Permit. Waterkeeper appeals.
STANDARD OF REVIEW
¶12 We review a district court's grant of summary judgment de novo, and apply the same criteria applied by the district court under M. R. Civ. P. 56(c). N. Cheyenne Tribe v. Mont. Dep't of Envtl. Quality , 2010 MT 111, ¶ 18, 356 Mont. 296, 234 P.3d 51.
¶13 This Court affords deference to an agency's legal determination when that agency is interpreting a statute that it has been authorized by the legislature to administer. Lewis v. B & B Pawnbrokers, Inc. , 1998 MT 302, ¶ 43, 292 Mont. 82, 968 P.2d 1145. We defer to an agency's interpretation of its rule unless it is plainly inconsistent with the spirit of the rule; however, neither this Court nor the district court must defer to an incorrect agency decision. Clark Fork Coal. v. Mont. Dep't of Envtl. Quality , 2008 MT 407, ¶ 20, 347 Mont. 197, 197 P.3d 482.
¶14 We review an informal agency decision-one not classified as a contested case under the Montana Administrative Procedure Act-to determine whether the decision was arbitrary, capricious, unlawful, or not supported by substantial evidence. Clark Fork Coal. , ¶ 21. Our ***271 review under this standard focuses on whether the agency action is (1) unlawful, or (2) arbitrary and capricious. North Fork Pres. Ass'n v. Dep't of State Lands , 238 Mont. 451, 459, 778 P.2d 862, 867 (1989).
DISCUSSION
¶15 1. Whether the General Permit complies with public participation requirements?
¶16 Waterkeeper, a public-benefit non-profit corporation dedicated to protecting the water quality of Montana's Upper Missouri River Basin, argues that the General Permit does not comply with mandatory public participation requirements pursuant to both federal and state law because the General Permit contains BMP and TMDL requirements that are chosen by individual MS4s under the General Permit after the General Permit has already been issued. The District Court found that the permit did not violate public participation requirements because the General Permit, and its included BMPs and TMDLs, were already subject to public review and comment. The District Court further noted that the General Permit contains language requiring additional public outreach, education, participation, and review. We agree with the District Court that the General Permit does not violate public participation requirements.
¶17 After two MS4 general permit iterations, DEQ began development on the third. Concerned and motivated by the desire to develop a quality, modern permit, the MS4 cities requested, received, and spearheaded a storm water working group to develop the third general permit. The previous general permit was then extended for a two-year period by DEQ while the storm water working group went to work. The General Permit was developed over a nearly two-year period with input from DEQ, Montana MS4s, environmental groups (including Waterkeeper), and the general public. At the public hearing on the permit prior to its issuance, Waterkeeper even testified to the General Permit being "a really good permit." The District Court correctly noted that the General Permit had significant public participation during its development and before it was ultimately issued by DEQ.
¶18 Waterkeeper now takes issue with the General Permit's inclusion of a menu of possible BMPs for individual MS4s to choose from when implementing their SWMP. Because the final BMPs are not chosen until after the issuance of the General Permit, Waterkeeper argues that when a BMP is ultimately chosen by an MS4, that constitutes a change that adds significant new conditions to the MS4 permit. This argument is unconvincing. The BMPs listed in the General Permit were developed with two years of input from numerous ***272 stakeholders, including the general public. The MS4s regulated by the General Permit are essentially being tasked with choosing from an already-approved menu. Much like the experience of attending a wedding reception does not become a fundamentally different activity for a guest once he or she chooses between the given dinner options of chicken or fish, an *798 MS4 choosing which preapproved BMPs to implement in their SWMP does not alter the essential terms of the General Permit. The guest is still attending a wedding reception regardless of his or her dinner choice; and Montana's MS4s are still having their storm water discharges regulated pursuant to the existing terms of the General Permit regardless of which combination of already-specified BMPs are ultimately used. EPA's small MS4 regulations were developed to allow for flexibility in permitting. See National Pollutant Discharge Elimination System--Regulations for Revision of the Water Pollution Control Program Addressing Storm Water Discharges, 64 Fed. Reg. 68,722, 68,754 (Dec. 8, 1999). It is not unlawful, arbitrary, or capricious for DEQ to use this intentional flexibility when issuing MPDES permits.
¶19 Although this is a matter of first impression in Montana, Maryland's highest court recently faced a nearly identical situation of an MS4 choosing from a specified menu of BMPs in an NPDES general permit and a local water group objecting based on public participation requirements. In Md. Dep't of the Env't v. Anacostia Riverkeeper , 447 Md. 88, 134 A.3d 892 (2016), the Maryland Court of Appeals addressed an NPDES general permit affecting several counties in Maryland. Local water groups sued alleging, among other things, that the permit violated public participation requirements because MS4 permittees would be choosing BMPs after the permit was issued. The water groups cited to Waterkeeper All., Inc. v. EPA , 399 F.3d 486 (2d Cir. 2005), a case in which the Second Circuit addressed the regulation of water pollutants in runoff from concentrated animal feeding operations (CAFOs). The CAFOs at issue in the case were required to develop nutrient management plans, which the Second Circuit held were effluent limits because the CAFOs were required to set waste application rates in the plans. Waterkeeper All. , 399 F.3d at 502. The Second Circuit therefore found that EPA was "arbitrary and capricious" by "failing to require that the terms of the nutrient management plans be included in NPDES permits." Waterkeeper All. , 399 F.3d at 502-03.
¶20 The Maryland Court of Appeals distinguished Waterkeeper All. and determined the practice of general permits allowing MS4s to select from BMPs does not constitute a new effluent limitation requiring ***273 another period of public participation. The Maryland Court found that "the most critical element of the restoration plans-the BMPs-is already included in the Permits because the Permits incorporate the Manual and Guidance, which set forth those practices." Md. Dep't of the Env't , 134 A.3d at 942. The Maryland Court upheld the permits because "the Counties must submit restoration plans derived from specified best management practices[.]" Md. Dep't of the Env't , 134 A.3d at 942 (emphasis in original). The situation at issue with the General Permit in this case is nearly identical to that of Md. Dep't of the Env't , and we reach the same conclusion with respect to public participation requirements. The act of an MS4 choosing between specified BMPs in an MPDES general permit does not constitute a new effluent limit requiring further public participation before the permit can take effect.
¶21 2. Whether DEQ's decision to incorporate construction and post-construction storm water pollution controls into the General Permit was unlawful, arbitrary, or capricious?
¶22 Waterkeeper argues that the General Permit's construction and post-construction storm water pollution controls are arbitrary and capricious because the standards set by DEQ for runoff control are both legally inadequate and unsupported by substantial evidence.
¶23 This court applies "a deferential standard of review to an agency's interpretation in matters of its expertise." Somont Oil Co. v. King , 2012 MT 207, ¶ 18, 366 Mont. 251, 286 P.3d 585. We have previously held that administrative interpretations are not binding on courts, but they are entitled to "respectful consideration." Mont. Power Co. v. Mont. PSC , 2001 MT 102, ¶ 25, 305 Mont. 260, 26 P.3d 91 (quoting Doe v. Colburg , 171 Mont. 97, 100, 555 P.2d 753, 754 (1976) ).
¶24 The six MCMs required to be included in an NPDES permit by EPA are: (1) public education and outreach on storm water impacts; (2) public involvement/participation; (3) illicit discharge detection and elimination; (4)
*799 construction site storm water runoff control; (5) post-construction storm water management in new development and redevelopment; and (6) pollution prevention/good housekeeping for municipal operations. 40 C.F.R. § 122.34(b). Montana has adopted the same six MCMs essentially verbatim. See Admin. R. M. 17.30.1111(6) (2016).
¶25 "Permits for discharges from municipal storm sewers ... shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or the State determines appropriate ***274 for the control of such pollutants." 33 U.S.C. § 1342(p)(3)(B)(iii). The General Permit requires that all MS4s regulate both construction and post-construction storm water runoff through the use of BMPs and MCMs. Waterkeeper alleges that these permit conditions fail to meet the "maximum extent practicable" standard required by the CWA.
¶26 EPA recently modified the regulations for NPDES MS4 permits, which became effective for all MS4 permits issued on or after January 9, 2017. See National Pollutant Discharge Elimination System (NPDES) Municipal Separate Storm Sewer System General Permit Remand Rule, 81 Fed. Reg. 89,320, 89,345 (Dec. 9, 2016). Prior to these changes, federal regulations noted that "narrative effluent limitations requiring implementation of best management practices (BMPs) are generally the most appropriate form of effluent limitations when ***275 designed to satisfy technology requirements (including reductions of pollutants to the maximum extent practicable) and to protect water quality." 40 C.F.R. § 122.34(a) (2016). Permits issued under the new regulations may include "numeric ... requirements." 40 C.F.R. § 122.34(a).
¶27 The General Permit in this matter was issued on November 30, 2016, and became effective on January 1, 2017. EPA did not require permits issued prior to January 9, 2017, to comply with the new requirements of the rule. National Pollutant Discharge Elimination System (NPDES) Municipal Separate Storm Sewer System General Permit Remand Rule, 81 Fed. Reg. at 89,345 -46. When the permit was issued, EPA regulations specifically stated that narrative effluent limitations were the most appropriate form of effluent limitations. DEQ issued the General Permit consistent with these regulations, as it contains numerous BMPs for each MCM to allow an MS4 to meet its water quality goals. The Court also notes that EPA "intentionally [did] not provide[ ] a precise definition of MEP to allow maximum flexibility in MS4 permitting." National Pollutant Discharge Elimination System--Regulations for Revision of the Water Pollution Control Program Addressing Storm Water Discharges, 64 Fed. Reg. at 68,754. "Implementation of best management practices consistent with the provisions of the storm water management program required pursuant to this section and the provisions of the permit required pursuant to § 122.33 constitutes compliance with the standard of reducing pollutants to the 'maximum extent practicable.' " 40 C.F.R. § 122.34(a) (2016). Following the guidance of the EPA, Montana has similarly determined that
narrative effluent limitations requiring implementation of BMPs are the most appropriate form of effluent limitations when designed to satisfy technology requirements (including reductions of pollutants to the maximum extent practicable) and to protect water quality. Implementation of BMPs consistent with the provisions of the storm water management program required pursuant to this rule and the provisions of the permit shall constitute compliance with the standard of reducing pollutants to the maximum extent practicable.
Admin. R. M. 17.30.1111(5)(a) (2016).
¶28 The General Permit contains a list of BMPs applicable to each MCM. For the construction site storm water management MCM, the list of BMPs is nearly seven pages long. The post-construction site storm water management in new and redevelopment MCM contains a list of applicable BMPs nearly eight pages long. Under the EPA and DEQ regulations in place at the time, implementation of these BMPs "constitute[s] compliance" with the MEP standard.
¶29 Waterkeeper specifically alleges that the post-construction storm water management requirements of the General Permit are *800 deficient in that they require that all MS4s implement post-construction storm water management "controls that are designed to infiltrate, evapotranspire, and/or capture for reuse the post-construction runoff generated from the first 0.5 inches of rainfall from a 24-hour storm preceded by 48 hours of no measurable precipitation." This specific 0.5-inch performance standard is unchanged from the 2015 general permit, and DEQ notes that it represents the 90th percentile rainfall frequency event. Waterkeeper contends that this standard is arbitrary and capricious because the General Permit's rule requiring capture of only the 90th percentile is not fully supported by substantial evidence, and therefore does not meet the MEP standard. Waterkeeper notes that a general permit issued in eastern Washington requires 100% retention of post-construction storm water runoff and faults DEQ for not sufficiently explaining why this standard would not be practicable in Montana.
¶30 The record reflects that DEQ did explain its decision in setting the numerical standard at issue here. More importantly, however, the General Permit includes several new BMP requirements to allow MS4s to meet the MEP standard. The numerical requirement is only one portion of the MCM, and DEQ has adequately explained its reasoning for setting this standard. Because we defer to an agency's determination in areas of its expertise, it was not arbitrary and capricious for DEQ to use its chosen post-construction storm water runoff standard in the General Permit. Somont Oil Co. , ¶ 18. The numerical runoff control standard has not changed from the 2015 ***276 general permit; however, the narrative standards have improved in the General Permit. Pursuant to both federal and state regulations, and mindful of the deference afforded to DEQ, these narrative effluent limitations constitute compliance with the MEP standard.
¶31 Waterkeeper also faults the General Permit's construction site storm water management MCM for incorporating the minimum standards from another permit-the Non-Numeric Technology-Based Effluent Limits in the most current Montana DEQ General Permit for Storm Water Discharges Associated with Construction Activity (Construction Storm Water Permit)-into the General Permit here. Waterkeeper alleges that this decision is unsupported because the MEP standard may require more stringent standards and controls than those found in the Construction Storm Water Permit. DEQ explained that this overlap was done to ensure regulatory consistency, because numerous construction sites are located within the boundaries of the MS4s regulated by the General Permit. The record supports that DEQ's decision to incorporate the standards of the Construction Storm Water Permit into this portion of the General Permit was not arbitrary and capricious. DEQ provided reasons for why the decision was made; the record supports the conclusion that these incorporated standards, when combined with other BMPs in the General Permit, meet the MEP standard for narrative effluent limits; and the General Permit improves on the ordinances required by the 2015 general permit. Once again, we defer to DEQ's decision because it considered relevant factors regarding this MCM and there has not been "a clear error of judgment." North Fork Pres. Ass'n , 238 Mont. at 465, 778 P.2d at 871 (citation omitted).
¶32 3. Whether DEQ incorporating TMDLs into the General Permit was unlawful, arbitrary, or capricious?
¶33 Waterkeeper argues that the General Permit violates the CWA by not including water quality based effluent limitations (WQBELs) necessary to meet water quality standards for impaired waterbodies, but instead incorporates TMDL waste load allocations (WLAs). The General Permit incorporates applicable TMDLs for certain MS4s's impaired waterways. Waterkeeper alleges that this TMDL WLA incorporation is a violation of the CWA because the General Permit neither establishes baseline levels of pollution nor requires measurable pollutant reductions.
¶34 When developing water quality-based effluent limits for a permit, DEQ is required to ensure that those effluent limits "are consistent with the assumptions and requirements of any available wasteload allocation for the discharge prepared by the State and ***277 approved by EPA pursuant to *801 40 CFR 130.7." 40 C.F.R. § 122.44(d)(1)(vii)(B). The plain language of EPA's regulations requires that TMDL-based limits must be "consistent" with available WLAs, they do not require that the limitations "be identical to any of the WLAs that may be provided in a TMDL." In re City of Moscow , 10 E.A.D. 135, 148 (2001) (emphasis in original). We have previously noted EPA's stated goal of flexibility in small MS4 permitting. Opinion, ¶¶ 18, 27; National Pollutant Discharge Elimination System--Regulations for Revision of the Water Pollution Control Program Addressing Storm Water Discharges, 64 Fed. Reg. at 68,754. Due to this flexibility, DEQ can use its discretion when determining the planning goals of a TMDL and its associated WLA for a regulated MS4. The District Court found that Waterkeeper's issue is not with the General Permit but with the language of the TMDLs themselves. We agree.
¶35 On appeal, Waterkeeper argues that the District Court misunderstood its position, and it is simply arguing that DEQ abused its discretion by not including enforceable and measurable pollutant reduction requirements tied to applicable WLAs. The General Permit requires MS4s to apply BMPs which address impaired waterbodies, report their progress, show their upcoming plans, implement a monitoring program, and provide a mechanism for public review. DEQ's interpretation of its rule regarding TMDLs is not unlawful, arbitrary, capricious, or unsupported by substantial evidence because EPA first approved the TMDLs in a separate process and then reviewed and concurred in the issuance of the General Permit which contained those TMDLs. Clark Fork Coal. , ¶ 20. As the District Court correctly noted in its summary judgment order, "water quality planning goals will be met by continuing to adhere to the Permit's BMP requirements to reduce pollutant loading."
¶36 4. Whether DEQ's decision to incorporate pollution monitoring requirements into the General Permit was unlawful, arbitrary, or capricious?
¶37 Finally, Waterkeeper alleges that the General Permit violates federal monitoring regulations. Specifically, Waterkeeper claims that the General Permit both fails to provide for monitoring that is representative of the MS4 system and provide for monitoring that is sufficient to ensure compliance with the General Permit's terms.
¶38 DEQ has a statutorily broad authority to require monitoring of discharges into state waters. Section 75-5-602, MCA. In addition, DEQ "may require monitoring of storm water discharges at a facility or activity covered under an MPDES general permit." Admin. R. M.
***278 17.30.1351(2) (2016). Notably, neither EPA's Phase II Rule for small MS4s nor DEQ's own small MS4 permitting rules require monitoring, though EPA does encourage monitoring. 40 C.F.R. § 122.34 (2016) ; Admin R. M. 17.30.1111 (2016).
¶39 DEQ, in its discretion, required all MS4 permittees to monitor storm water discharges in this iteration of the General Permit. The General Permit provides MS4s a choice of different monitoring options, and increases the number of required samples from the 2015 version of the general permit. DEQ used its discretion to require representative monitoring, which Waterkeeper objects to because it believes this monitoring scheme is not truly representative of the vast MS4 districts covered by the General Permit.
¶40 As discussed above, this Court will defer to an agency acting within its area of expertise. Somont Oil Co. , ¶ 18. "We cannot substitute our judgment for that of the Department by determining whether its decision was correct." North Fork Pres. Ass'n , 238 Mont. at 465, 778 P.2d at 871 (internal quotation omitted). The pollution monitoring requirements at issue here are squarely within DEQ's area of expertise, are not required by either federal or state regulations, and are supported by substantial evidence of their improvements from the last general permit.
CONCLUSION
¶41 We remain mindful of the fact that Montanans have a constitutional right to a clean and healthful environment. Mont. Const. art. II, § 3. The General Permit at issue in this case represents a clear improvement from its previous iteration, a fact Waterkeeper itself acknowledged when testifying regarding the General Permit. This Court *802 does not have the authority to review the General Permit line by line to subjectively determine whether each decision made by DEQ in this matter is the "correct" one, but under the applicable standard of review DEQ's decisions have not been unlawful, arbitrary, or capricious. North Fork Pres. Ass'n , 238 Mont. at 465, 778 P.2d at 871. The General Permit is not the end of the responsibility for DEQ and the MS4s to improve Montana's water quality, but simply another step along the way. This General Permit is a step in the right direction.
¶42 The District Court correctly denied Waterkeeper's Motion for Summary Judgment, granted DEQ and the City of Billings' Cross-Motions for Summary Judgment, and affirmed DEQ's issuance of the General Permit.
¶43 Affirmed.
We concur:
JAMES JEREMIAH SHEA, J.
BETH BAKER, J.
LAURIE McKINNON, J.
DIRK M. SANDEFUR, J.

At the time known as the State of Montana Department of Health and Environmental Sciences.

40 C.F.R. § 122.34 was amended in 2017, removing this option. The General Permit at issue in this case was issued prior to the 2017 amendment.

The 2017 amendment to 40 C.F.R. § 122.34 added numerical effluent limitations to this section, along with a requirement that terms and conditions under small MS4 permits "must be expressed in clear, specific, and measurable terms."