FILED

11/17/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0553

DA 19-0553

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2020 MT 288

MONTANA ENVIRONMENTAL INFORMATION
CENTER, SAVE OUR CABINETS, AND EARTHWORKS,

        Plaintiffs, Appellees,
        and Cross-Appellants,

    v.

MONTANA DEPARTMENT OF ENVIRONMENTAL
QUALITY and MONTANORE MINERALS CORP.,

        Defendants, Appellants,
        and Cross-Appellees.

APPEAL FROM:    District Court of the First Judicial District,
                   In and For the County of Lewis and Clark, Cause No. CDV 2017-641
                   Honorable Kathy Seeley, Presiding Judge

COUNSEL OF RECORD:

      For Defendants, Appellants, and Cross-Appellees:

         William W. Mercer, Kyle Anne Gray, Brianne C. McClafferty, Victoria A.
         Marquis, Holland & Hart LLP, Billings, Montana
         (for Montanore Minerals Corp.)

         Kurt R. Moser, Special Assistant Attorney General, Helena, Montana
         (for Montana Department of Environmental Quality)

      For Plaintiffs, Appellees, and Cross-Appellants:

         Katherine O'Brien, Timothy J. Preso, Jenny K. Harbine, Earthjustice
         Northern Rockies Office, Bozeman, Montana

      For Amicus Montana Chamber of Commerce:

         Steven T. Wade, M. Christy S. McCann, Browning, Kaleczyc, Berry &
         Hoven, P.C., Helena, Montana

Submitted on Briefs:  July 22, 2020

Decided:  November 17, 2020

Filed:

_____
Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 Defendants, Appellants, and Cross-Appellees Montana Department of Environmental Quality (DEQ) and Montanore Minerals Corp. (MMC) appeal the Order on Cross-Motions for Summary Judgment issued by the First Judicial District Court, Lewis and Clark County, on July 24, 2019, which denied DEQ's and MMC's cross-motions for summary judgment and vacated DEQ's 2017 issuance of Montana Pollution Discharge Elimination System (MPDES) Permit No. MT0030279 (2017 Permit) to MMC. Plaintiffs, Appellees, and Cross-Appellants Montana Environmental Information Center (MEIC), Save Our Cabinets, and Earthworks cross-appeal the District Court's partial denial of their motion for summary judgment.

¶2 We address the following dispositive issue on appeal:

> *Whether DEQ unlawfully relied upon a 1992 Order of the Board of Health and Environmental Sciences when issuing the 2017 Permit.*

¶3 We affirm the District Court's vacatur of the 2017 Permit and remand to DEQ for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 This case arises out of the Montanore Project, a proposed copper and silver mine located in the Cabinet Mountains of northwestern Montana. Silver deposits were discovered at the site of the proposed project in the early 1980s, and the permitting process for the Montanore Project began later that decade. In 1989, the Noranda Minerals Corporation (Noranda) obtained an exploration license from the Montana Department of

3

State Lands for the construction of an exploration adit in upper Libby Creek.[1]  Libby Creek is a critical habitat for bull trout.  Noranda also applied for an operating permit to authorize mining.

¶5     On December 13, 1989, Noranda filed a Petition for Change in Quality of Ambient Waters with the Montana Board of Health and Environmental Sciences (BHES), seeking authorization to lower the ambient surface and ground water quality for discharges from the proposed Montanore Project in Sanders and Lincoln Counties.  Pursuant to the nondegradation policy in effect at that time, BHES was allowed to authorize lower water quality if a showing was made that degradation was justified "as a result of necessary economic or social development[.]"  Section 75-5-303(1), MCA (1989).

¶6     In 1991, after constructing around 14,000 feet of the Libby Creek adit, Noranda ceased construction of the adit due to elevated nitrate concentration in the surface water and low metal prices.  Though Noranda ceased construction of the adit in 1991, the permitting process continued.  On November 20, 1992, BHES issued its Final Decision and Statement of Reasons (BHES Order) on Noranda's petition to lower the ambient water quality, finding that degradation of the subject waters was justified due to the beneficial economic and social impacts that would come with the mine.  The BHES Order set specific numeric limitations on certain contaminants, applicable to the surface and ground water that would be affected by the Montanore Project.  The provisions of the BHES Order were

_____

[1] An adit is a horizontal entrance to an underground mine.

to "remain in effect during the operational life of this mine and for so long thereafter as necessary."

¶7      In June 1992, the State of Montana Department of Health and Environmental Sciences (DHES) filed a Complaint and Application for Injunction against Noranda, alleging Noranda violated Montana's Water Quality Act (WQA) at the Libby Creek site. DHES filed its complaint after being notified by the United States Environmental Protection Agency (EPA) that it believed Noranda had violated the Clean Water Act (CWA) at the Libby Creek site.[2]   On May 12, 1993, the Montana Nineteenth Judicial District Court, Lincoln County, issued its Findings of Fact, Conclusions of Law, Judgment and Consent Decree, which, in relevant part, required Noranda to pay fines and apply for an MPDES permit.

¶8      Pursuant to the CWA, Congress established a permitting system known as the National Pollution Discharge Elimination System (NPDES), which is administered by the EPA.  The CWA allows for states to administer their own permits, however, and in 1974 the State of Montana and EPA signed a Memorandum of Agreement (MOA), which transferred the responsibility of issuing NPDES permits within Montana to DEQ.[3] Pursuant to this arrangement, DEQ is responsible for issuing MPDES permits.  Though the

_____

[2] Congress enacted the modern version of the Federal Water Pollution Control Act, more commonly known as the CWA, in 1972.  The stated objective of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

[3] At the time known as DHES.

responsibility of issuing MPDES permits has been transferred to DEQ, EPA continues to review, comment on, and/or make recommendations to DEQ regarding proposed MPDES permits. Under the MOA, if EPA does not object to a proposed permit, its non-objection "shall be considered as concurrence" in the issuing of the permit.

¶9 Noranda ultimately obtained its MPDES permit for the Montanore Project in 1997. The permit allowed discharges from the Libby adit to Libby Creek and nearby groundwater. The 1997 permit allowed three outfalls: Outfall 001 for a percolation pond discharging to groundwater; Outfall 002 for a drainfield with three infiltration zones discharging to groundwater; and Outfall 003 for a pipeline outlet to Libby Creek. In 2001, Noranda applied to renew the MPDES permit. DEQ administratively extended the MPDES permit past its February 28, 2002 expiration date while it considered Noranda's September 17, 2001 permit renewal application. In September 2002, Noranda informed DEQ and the Kootenai National Forest (KNF) that it was relinquishing its approval to operate and construct the Montanore Project. Noranda requested termination of its MPDES permit in March 2003, but DEQ denied the request, noting "that it may be necessary to maintain the MPDES permit until reclamation work was completed." Noranda had previously closed the adit and started reclamation work, which was not fully completed by the time it requested termination of the MPDES permit in 2003. Noranda's other permits for the proposed mine, outside of the MPDES permit and DEQ-issued Hard Rock permit #00150, either expired or were terminated by 2002. *See Mines Mgmt., Inc. v. Fus*, 2019 MT 276, ¶ 8 n.6, 398 Mont. 15, 453 P.3d 371.

¶10   In 2004, after DEQ denied Noranda's request to terminate the MPDES permit, Mines Management, Inc. (MMI)—MMC's parent company—submitted a proposed plan of operations for the Montanore Project to the KNF.[4]  Ultimately, DEQ renewed Noranda's MPDES permit on March 21, 2006.  The renewed permit went into effect on April 1, 2006, and again permitted three outfalls.  DEQ's environmental assessment produced during that renewal noted that the "adit has been closed and the facility is in its final reclamation stages."  It further noted that no discharge had been reported since 1998.

¶11   In May 2006, Newhi, Inc., a wholly owned subsidiary of MMI, acquired all issued and outstanding shares of Noranda and changed Noranda's name to MMC.[5]  MMC reversed course from Noranda's previous reclamation of the adit and "began using the adit for access purposes, engaging in dewatering and rehabilitation activities in preparation for actual mining operations."  *Mines Mgmt.*, ¶ 9.  DEQ modified the 2006 Renewed Permit

---

[4] The Dissent argues that MMI's proposed plan of operations submitted to the KNF "led to MMI's corresponding application for renewal of the MPDES Permit[.]"  Dissent, ¶ 31.  It's true that MMI submitted a new proposed plan of operations to KNF in 2004, but MMI did not own Noranda in 2004 and it cannot be rationally asserted that MMI's submission to KNF was relevant to Noranda's repeated requests to give up the MPDES permit.  As has been previously noted, it was Noranda who applied for the renewal of the MPDES permit on September 17, 2001.  That permit renewal was issued on March 21, 2006, and went into effect on April 1, 2006.  MMI's subsidiary, Newhi, Inc., did not acquire Noranda until May 31, 2006.

[5] The Dissent incorrectly asserts MMI applied for renewal of the Permit apparently sometime after submitting its proposed plan to the KNF in 2004.  The record does not support this assertion—the 2006 Permit itself says that DEQ "received a permit renewal application on September 17, 2001."  Noranda did not plan to abandon the MPDES permit when it applied for renewal in 2001, that happened in 2002 and 2003.  More importantly, MMI could not submit a permit renewal application on behalf of a company it did not own in 2001.

on May 23, 2008, to reflect the name change from Noranda to MMC. The permit's expiration date remained March 31, 2011.

¶12 In August 2010, MMC applied to renew the MPDES permit. In its renewal application, MMC requested five new stormwater-only outfalls—two of which would discharge into Libby Creek, one of which would discharge into Ramsey Creek, and two of which would discharge into Poorman Creek. In February 2011, DEQ administratively extended the 2006 Renewed Permit pending issuance of a renewed permit based on MMC's 2010 application. DEQ issued a draft permit, fact sheet, and public notice in 2015, and a revised draft permit, fact sheet, and public notice in 2016. On December 15, 2015, KNF and DEQ issued a Joint Final Environmental Impact Statement (EIS) for the proposed Montanore Project. The Final EIS noted MMC's proposed Montanore plan was "considered as a new proposed Plan of Operations by the KNF because [Noranda] relinquished the federal approval to construct and operate the Montanore Project in 2002."

¶13 DEQ approved MMC's application on January 17, 2017. Pursuant to the Montana Administrative Procedure Act (MAPA), MMC appealed certain provisions of the 2017 permit in February 2017. The 2017 MPDES permit went into effect, except for those provisions stayed by DEQ in response to the MAPA action, on March 1, 2017. The 2017 MPDES permit added MMC's five new requested stormwater outfalls, which allowed discharges directly into both Ramsey Creek and Poorman Creek. MEIC, Save Our Cabinets, and Earthworks (collectively MEIC) filed a Complaint for Declaratory Relief in the Montana First Judicial District Court, Lewis and Clark County, on August 15, 2017,

seeking a judicial declaration that DEQ's 2017 issuance of the MPDES permit to MMC was unlawful and must be vacated.

¶14 On May 29, 2018, MEIC moved for summary judgment, arguing DEQ failed to establish mandatory technology-based effluent limitations; that DEQ failed to conduct a valid reasonable potential analysis to determine the need for water quality-based effluent limitations; that DEQ unlawfully relied on the 1992 BHES Order; and that the permit contains unlawful compliance schedules. DEQ and MMC each filed cross-motions for summary judgment on June 29, 2018, seeking to uphold DEQ's issuance of the 2017 Permit. After the parties completed briefing the motions, the District Court held oral argument on February 11, 2019. The District Court issued its Order on Cross-Motions for Summary Judgment on July 24, 2019, granting MEIC's motion in most respects, denying DEQ and MMC's cross-motions, and vacating the 2017 MPDES permit. The parties cross-appeal. Additional facts will be discussed as necessary below.

## STANDARD OF REVIEW

¶15 We review a district court's grant or denial of summary judgment de novo, and apply the same criteria applied by the district court under M. R. Civ. P. 56(c). *N. Cheyenne Tribe v. Mont. Dep't of Envtl. Quality*, 2010 MT 111, ¶ 18, 356 Mont. 296, 234 P.3d 51. Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Mont. Envtl. Info. Ctr. v. Mont. Dep't of Envtl. Quality (MEIC IV)*, 2019 MT 213, ¶ 18, 397 Mont. 161, 451 P.3d 493.

¶16 We review an agency decision not classified as a contested case under MAPA to determine whether the decision was arbitrary, capricious, unlawful, or not supported by substantial evidence. *Mont. Envtl. Info. Ctr. v. Mont. Dep't of Envtl. Quality (MEIC III)*, 2016 MT 9, ¶ 14, 382 Mont. 102, 365 P.3d 454 (citing *Clark Fork Coal. v. Mont. Dep't of Envtl. Quality*, 2008 MT 407, ¶ 21, 347 Mont. 197, 197 P.3d 482). Our review under this standard focuses on whether the agency action is (1) unlawful, or (2) arbitrary and capricious. *N. Fork Pres. Ass'n v. Dep't of State Lands*, 238 Mont. 451, 459, 778 P.2d 862, 867 (1989). "While our review of agency decisions is generally narrow, we will not automatically defer to the agency without carefully reviewing the record and satisfying [our]selves that the agency has made a reasoned decision." *Clark Fork Coal.*, ¶ 21 (internal quotations and citations omitted).

## DISCUSSION

¶17 As a preliminary matter, we must first address the 1974 MOA between the EPA and Montana, which transferred the responsibility of issuing NPDES permits from EPA to DEQ, and its relation to the present case. Under the 1974 MOA, EPA's non-objection to an MPDES permit "shall be considered as concurrence" in the issuance of that permit. In this case, EPA commented on the draft permit, and ultimately did not object to the issuance of the 2017 Permit. Pursuant to the MOA, EPA therefore concurred in DEQ's issuance of that permit. While EPA concurred with DEQ's decision to issue the 2017 Permit, the ultimate decision to issue the permit was made by DEQ and it is DEQ which must justify its permitting decisions. *See S. Cal. All. of Publicly Owned Treatment Works v. EPA*, 853

10

F.3d 1076, 1081 (9th Cir. 2017). EPA's concurrence with the issuance of an MPDES permit may be persuasive, but its simple non-objection to the issuance of a permit cannot overcome decisions made by DEQ which are arbitrary, capricious, or unlawful. With this in mind, we turn now to the challenged 2017 Permit.

¶18 *Whether DEQ unlawfully relied upon a 1992 Order of the Board of Health and Environmental Sciences when issuing the 2017 Permit.*

¶19 We begin our review of the contested 2017 Permit nearly 30 years ago, by first addressing DEQ's reliance on the 1992 BHES Order. Since the BHES Order was issued in 1992, it has been relied upon by DEQ and other state and federal agencies tasked with permitting and determining the environmental impact of the Montanore Project. By its own terms, the BHES Order was to "remain in effect during the operational life of this mine and for so long thereafter as necessary." The District Court, in its Order on Cross-Motions for Summary Judgment, found the operational life of the mine "ended in 1991, when Noranda abandoned the project, relinquished its federal mining authorization, and began reclamation."

¶20 DEQ and MMC assert the District Court's conclusion that the operational life of the mine ended is incorrect and contend the operational life of the mine never ended. MEIC argues the District Court's reference to 1991 was either a typographical error or simply a harmless error, as it is clear from the language used in the Order that the District Court was referring to Noranda's 2002 abandonment of the Montanore Project, which it contends

ended the operational life of the mine.[6] We need not determine whether the District Court's conclusion that the operational life of the mine ended in 1991 was either a typographical or substantive error, because we are simply tasked with reviewing whether the BHES Order was still in effect at the time DEQ issued the 2017 Permit, and, regardless, we "will affirm the district court if it reaches the right result, even for the wrong reason." *Vote Solar v. Mont. Dep't of Pub. Serv. Regulation*, 2020 MT 213A, ¶ 64, 401 Mont. 85, 473 P.3d 963 (citing *State v. Ellison*, 2012 MT 50, ¶ 8, 364 Mont. 276, 272 P.3d 646). Upon our de novo review of the record, we find that the operational life of the mine referred to in the 1992 BHES Order ended when Noranda abandoned the project in 2002 and that DEQ unlawfully relied upon the BHES Order when issuing the 2017 Permit.

¶21 The BHES Order was issued in 1992, at a time when Montana's nondegradation policy allowed BHES to authorize lower water quality if a showing was made that degradation was justified "as a result of necessary economic or social development[.]" Section 75-5-303(1), MCA (1989). In 1993, the Legislature revised the nondegradation policy for all future requests to degrade state waters, but did not make those changes retroactive. 1993 Mont. Laws ch. 595, § 10. Montana's current nondegredation policy states:

> The department may not authorize degradation of high-quality waters unless
> it has been affirmatively demonstrated by a preponderance of evidence to the
> department that:

---

[6] The Dissent implies we, similarly to the District Court, conclude the operational life of the mine ended in 1991. Dissent, ¶ 31 n.3. As fully explained above, this is completely inaccurate.

(a) degradation is necessary because there are no economically, environmentally, and technologically feasible modifications to the proposed project that would result in no degradation;

(b) the proposed project will result in important economic or social development and that the benefit of the development exceeds the costs to society of allowing degradation of high-quality waters;

(c) existing and anticipated use of state waters will be fully protected; and

(d) the least degrading water quality protection practices determined by the department to be economically, environmentally, and technologically feasible will be fully implemented by the applicant prior to and during the proposed activity.

Section 75-5-303(3), MCA.

¶22 Noranda first petitioned BHES for an order allowing it to degrade state waters as part of the proposed Montanore Project in 1989, and was ultimately granted that authorization in 1992. The BHES Order set numeric effluent limitations on specific contaminants above ambient conditions, and, by its own terms, was to "remain in effect during the operational life of this mine and for so long thereafter as necessary." DEQ found the 1992 BHES Order was still in effect when it issued the 2017 Permit, because it believes the operational life of Noranda's mine never ended. DEQ's conclusion in this regard is incorrect.

¶23 The WQA generally requires DEQ to conduct a nondegradation review before it issues an MPDES permit, unless a proposed activity will result in only nonsignificant changes to water quality. *See Clark Fork Coal.*, ¶¶ 11-12. In this case, DEQ did not conduct a full nondegredation review because it determined the BHES Order already

13

provided the authorization for MMC to degrade at the levels referred to in the BHES Order. Noranda first applied for authorization to degrade in 1989, and ultimately obtained the BHES Order in 1992. Using, in part, the effluent limitations set by the BHES Order, DEQ issued the first MPDES permit to Noranda in 1997.

¶24 By 1991, Noranda had ceased construction on the adit due to elevated nitrogen and low metal prices. Noranda continued to seek state and federal permits for the Montanore Project after 1991, however, in anticipation of constructing the mine at some point. After receiving the MPDES permit in 1997, Noranda stopped discharging in 1998. In 2001, Noranda applied to renew the MPDES permit; however, by 2002, Noranda totally abandoned the project, relinquished or attempted to relinquish its permits, and had almost completed reclamation work it began years earlier. DEQ did not allow Noranda to relinquish its MPDES permit at this time because it found reclamation work at the site was not entirely complete. By the time of the 2006 permit renewal, DEQ found that reclamation was "in its final stages" and noted the lack of discharges since 1998. Just about a month after Noranda received the 2006 renewal, it was acquired and turned into MMC.[7] MMC

---

[7] The Dissent argues that "operation of the mine was clearly revived as a purpose of the Permit in 2004 and was specifically considered during the 2004-2006 Permit renewal process[.]" Dissent ¶ 33. To reach this conclusion the Dissent must ascribe the 2004 actions of MMI—which was a completely unrelated company that had zero ownership interest in Noranda—relating to its application for other non-MPDES permits to its later 2006-acquired subsidiary, Noranda (which then became MMC). MMI did not own Noranda in 2004. It is absurd to suggest that MMI's actions can somehow be imputed to Noranda during this period when it is undisputed Noranda itself was attempting to abandon its permits. An, at the time, completely unrelated company stating its desire to build the Montanore Project cannot override Noranda's stated aims to abandon the project. That MMI later acquired Noranda after the 2006 Permit renewal does not negate Noranda's abandonment of all mining operations and representations of abandoning all of its

14

changed course from reclamation to, once again, seeking to construct and operate an active mine.

¶25 The "operational life" of the mine referred to in the 1992 BHES Order ended in 2002 when Noranda abandoned the project and relinquished or attempted to relinquish its permits to construct and operate the Montanore Project. Without the relevant permits to operate a mine, which Noranda voluntarily gave up, it is abundantly clear that the mine could no longer be considered "operational" in any sense. By its own terms, however, the BHES Order was to be in effect beyond the operational life of the mine, "for so long thereafter as necessary." In 2003, DEQ informed Noranda it would likely be necessary to keep the MPDES permit in place while final reclamation work was completed. Noranda's reclamation work was apparently somehow still not completed by the time it was acquired

permits. In addition, the 2006 permit renewal process began with Noranda's application in 2001, not in 2004 as the Dissent claims. To support its assertion that MMI initiated the MPDES renewal process, the Dissent cites to the District Court's Order on Cross-Motions for Summary Judgment. Dissent, ¶ 31 n.4. This notation is somewhat misleading. The District Court's Order noted, "[i]n 2004, Mines Management, Inc., submitted an application for a 'renewed MPDES permit that covered additional discharges not currently permitted under the existing MPDES permit.'" The District Court cited to the 2015 Final EIS for this contention. That document states, "[i]n 2004, MMI submitted an application for a hard rock operating permit to the DEQ and a pro-posed Plan of Operations for the Montanore Project to the KNF. In 2005, MMI also submitted to the DEQ an application for a 230-kV transmission line certificate of compliance, an application for an air quality permit, and an application for a renewed MPDES permit that covered additional discharges not currently permitted under the existing MPDES permit." Quite notably, the only place this language appears to be found in the administrative record is in the draft and final environmental impact statements for the Montanore Project, while the actual 2006 Permit is completely silent on both any alleged MMI involvement in the MPDES permitting process and any request for additional discharges not already allowed by the 1997 Permit. As both the Fact Sheet to the 2017 Permit and DEQ's 2016 Record of Decision for the Montanore Project note, the first request for additional discharges under MPDES Permit No. MT0030279 was made in 2010, after Noranda was purchased by MMI and became MMC.

15

and became MMC in 2006, even though it ceased construction on the Libby Adit in 1991, stopped discharging in 1998, and had sought to abandon the project and relinquish the MPDES permit in 2002. It would be absurd to interpret the BHES Order's "as necessary" language to include Noranda's abandonment of the project and nearly-complete reclamation work to extend to MMC's proposed new mine project. While DEQ could force Noranda to maintain its MPDES permit to complete reclamation work, it could not later issue an MPDES permit with degradation standards from the 1992 BHES Order to MMC because that order had plainly expired as soon as the project transitioned to reclamation. It was no longer necessary at that point for the Montanore Project to adhere to the BHES-issued degradation standards from 1992, it was instead necessary for DEQ to conduct a full nondegredation review under current standards as required by the WQA. Section 75-5-303, MCA.

¶26    Once again, we reiterate that we "remain mindful of the fact that Montanans have a constitutional right to a clean and healthful environment." *Upper Mo. Waterkeeper v. Mont. Dep't of Envtl. Quality*, 2019 MT 81, ¶ 41, 395 Mont. 263, 438 P.3d 792 (citing Mont. Const. art. II, § 3). After our review of the record, we cannot find DEQ's interpretation that the 1992 BHES Order remains in effect was a "reasoned decision," and we will not defer to that interpretation. *Clark Fork Coal.*, ¶ 21. DEQ's use of an expired 1992 BHES Order to sidestep Montana's enhanced nondegredation policy, in effect since 1993, in issuing the 2017 permit was unlawful and rightly rejected by the District Court, because "Montana courts do not defer to incorrect or unlawful agency decisions[.]" *MEIC*

16

*IV*, ¶ 22.[8]  While the District Court's statement that the operational life of the mine ended in 1991 was incorrect, its ultimate conclusion that the operational life of the mine ended and the BHES Order expired prior to DEQ issuing the 2017 Permit was correct and is affirmed.

¶27    Because DEQ relied upon an expired BHES Order when it issued the 2017 Permit, we conclude the 2017 Permit was not validly issued and must be vacated.  Discharging pollutants into state waters without a valid NPDES permit is illegal under the CWA. 33 U.S.C. §§ 1311(a), 1342.  For MMC to pursue the project upon new application, DEQ will have to conduct the degradation review required by § 75-5-303(3), MCA, to determine if it is appropriate to authorize degradation and, if so, proceed to MPDES permitting.  We therefore remand this matter to DEQ for further action.  As this issue is dispositive, we decline to address the other issues appealed by the parties.[9]

---

[8] The Dissent notes that there are other water quality regulations outside the parameters of the BHES Order.  Dissent, ¶ 29 n.2.  While this may be accurate, it is irrelevant to the issue here as to whether the BHES Order had expired.  The Dissent also appears to assert that as the BHES Order refers to the *Montanore Mine Project*, that a subsequent company can completely avoid permitting a new mining operation so long as the new developer gives the project the same name as the previous defunct project.  Dissent, ¶ 33 n.5.  This is an odd reading under the facts of this case, as the new version of the Montanore Project is "considered as a new proposed Plan of Operations" by the relevant authorities because Noranda "relinquished the federal approval to construct and operate the Montanore Project in 2002."

[9] While recognizing a single issue can be determinative on appeal, the Dissent seems to take issue with determining this cause on this issue as the parties' briefing was not lengthy enough and this issue was not presented earlier in the briefing.  Of course, this assertion ignores the full record before us.  The parties fully presented this issue to the District Court which ruled upon the issue—setting forth its detailed rationale for vacating the permit based on expiration of the BHES Order.  Further, both parties clearly recognized this issue as an appeal issue as it is specifically delineated as an appeal issue in the parties' respective statements of issues.  From the briefing it is clear MEIC considers this issue determinative, devoting nearly seven pages of its opening brief to

**CONCLUSION**

¶28 DEQ acted arbitrarily, capriciously, and unlawfully by relying on the expired BHES Order when it issued the 2017 Permit. The 2017 Permit is vacated and this matter is remanded to DEQ for further action.

/S/ INGRID GUSTAFSON

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR

Justice Jim Rice, dissenting.

¶29 I have grave concerns about the Court's decision, particularly upon the very limited briefing the parties have submitted on the issue of the Montana Pollutant Discharge Elimination System (MPDES) Permit's reliance upon the Board of Health and Environmental Sciences (BHES) order. The impact of this holding is very significant: the

---

the issue—repeatedly asserting the BHES Order expired upon Noranda's abandonment of mining operations, had no application to the current project, and the District Court appropriately vacated the challenged permit in its entirety. DEQ clearly recognized it as an appeal issue, had full opportunity to brief it, and did not in any way indicate it was somehow precluded from doing so. The Dissent also suggests that perhaps the challenge regarding this issue is too late. This assertion appears primarily related to the Dissent's inaccurate conflation of MMI's and Noranda's separate projects at a time when they were two separate and distinct entities. Further, no party makes a waiver argument; at most, MMC asserts it shows "weakness" in MEIC's argument, but does not argue the issue should be precluded from consideration.

Court is sweeping away over 14 years of effort and costs expended by many parties and entities, including multiple government agencies, not just the Department of Environmental Quality (DEQ).[1]  Yet, in its opening brief, Appellant DEQ summarily discussed this issue in less than three pages, from page 43 to 45, while devoting extensive briefing to the District Court's reversal of DEQ's individual regulatory actions related to the Permit.  Similarly, starting at page 40 of its answer brief, Appellee Montana Environmental Information Center (MEIC) gave the issue about five pages of discussion after focusing heavily on the other issues.  Then, in reply, DEQ addressed the issue in a page and a half, simply noting that the BHES order "has not expired or otherwise been withdrawn.  As a result, DEQ implemented the BHES Order in site-specific discharge permits in 1997 and 2006 and does not have authority to disregard it."  This followed DEQ's explanation in its opening brief that it had applied the BHES Order for all "previous renewals of the Permit."[2]  While a single issue can be determinative on appeal, and a "sleeper" issue at that, given the circumstances here and the enormous impact, I would

---

[1] Over the years of the permit, agencies participating in review and regulation of the project include, in their various reconfigurations, DEQ, Department of State Lands, Department of Health and Environmental Sciences, Department of Natural Resources and Conservation, Environmental Protection Agency, Kootenai National Forest, and Bureau of Land Management.

[2] DEQ also explained that other regulations protecting water quality are in place for uses outside the parameters covered by the BHES order. *See also* Letter from John F. North, Chief Legal Counsel, DEQ, to Eric Klepfer, Klepfer Mining Services LLC, Re: Board Order & Water Quality Standards (Feb. 24, 2015), AR4J1 / 3564 (stating "Montanore will be required to comply with the new nutrient standards at the time its permit is renewed").

discretionarily order supplemental briefing so the parties could re-focus their arguments to give appropriate emphasis to what has developed to be a determinative question.

¶30    The Court concludes "that the operational life of the mine referred to in the 1992 BHES Order ended when Noranda abandoned the project in 2002 and that DEQ unlawfully relied upon the BHES Order when issuing the 2017 Permit." Opinion, ¶ 20. I believe the record reveals contrary indications about abandonment and the operational purpose of the mine, and that, as an issue of law, reliance upon the BHES order could have been challenged 14 years ago in 2006 when the Permit was renewed, and, thus, was waived at that time.

¶31    On November 20, 1992, as the Court notes, the BHES set forth in its "Final Decision and Statement of Reasons" that

> [t]he provisions of this Order are applicable to surface and ground water affected by the Montanore Mine Project located in Sanders and Lincoln County, Montana, and *shall remain in effect during the operational life of this mine and for so long thereafter as necessary*.

(Emphasis added.) Of course, the duration of the BHES order was not merely set by its terms, but also by statute. In 1993, the Legislature adopted revisions to its non-degradation policy, but directed it would apply only to permit requests "filed with the department after [April 29, 1993]," thus effectively "grandfathering" existing permits under the former policy. 1993 Mont. Laws ch. 595, § 10. This is why DEQ explains it "does not have authority" to disregard the BHES Order—it is a matter of statutory law. In 2004, Mines

Management, Inc. (MMI),[3] submitted a new plan for the Montanore Project to the Kootenai National Forest, but not merely for reclamation, rather, as the Court acknowledges, for operation of the mine. AR10B / 6293; Opinion, ¶ 10. That led to the MMI's corresponding application for renewal of the MPDES Permit,[4] and a public process undertaken by DEQ for review of that application. As DEQ later summarized in "Noranda Minerals Corp., MPDES Permit renewal—Response to Public Comment," issued March 20, 2006, along with the MPDES permit:

> On February 4, 2006, the Department issued Public Notice MT-06-01 presenting a tentative determination to issue a wastewater discharge permit renewal to Noranda Minerals Corp. The public notice stated that the Department had prepared a draft permit and statement of basis and that it was available for public review and comment. The notice required that all comments received or postmarked by March 6, 2006 would be considered in formulation of a final determination and issuance of the permit.

AR6C / 4576. DEQ provided several public notices of its preliminary determination for renewal of the Permit, "and for the holding of a public hearing as required in ARM Title 17, Chapter 30, and Subchapter 13." AR1C / 0065. Under the administrative rules governing issuance of MPDES permits,

---

[3] At this time, MMI held all Hayes Ridge (HR) lode mining claims relevant to the Montanore Project. Just two years prior, in 2002, Noranda Minerals terminated a lease agreement with Newhi, Inc. and conveyed HR 133 and 134 to Newhi, a subsidiary of MMI. AR 10B / 6224. In other words, at the time of MMI's 2004 application, MMI held the right to possess, develop, and extract minerals from the Montanore Project. As DEQ argues, "[t]he District Court's assertion that the operational life of the mine ended in 1991 is factually inaccurate," as is the Court's similar conclusion in ¶ 20.

[4] "In 2004, Mines Management, Inc., submitted an application for a 'renewed MPDES permit'. . . ." Order on Cross-Motions for Summary Judgment, 4, July 24, 2019, No. CDV-2017-641.

[a]ll persons, including applicants, who believe *any condition of a draft permit* is inappropriate or that the department's tentative decision to deny an application, terminate a permit, or prepare a draft permit is inappropriate, shall raise all reasonably ascertainable issues and submit all reasonably available arguments supporting their position by the close of the public comment period (including any public hearing) under ARM 17.30.1372.

Mont. Admin. R. 17.30.1375 (1989). (Emphasis added.) Consequently, public comments were taken and thereafter responded to by DEQ, ultimately resulting in the final issuance of the MPDES permit renewal, effective April 1, 2006. However, no party appealed DEQ's issuance of the renewed MPDES permit, including its reliance therein on the BHES order. *See* Mont. Admin. R. 17.30.109(1) (2018) (allowing for the permit applicant, person, or entity whose "substantial interests are adversely affected by" the agencies final action may appeal to the board "in writing and set forth the positions of the appealing party, the basis for the appeal, and the alleged errors of fact or law that were made by the department"). The issue of DEQ's reliance upon the BHES order could have been—and, to properly preserve a legal challenge to that reliance, should have been—raised after the public process upon the 2006 renewal of the MPDES permit. It was not challenged then, and therefore, it appears the issue is being challenged here 14 years too late.

¶32 The Court states that the company changed course from reclamation to an operational plan for the mine after receiving the 2006 permit renewal. Opinion, ¶ 24. However, it appears to me that this change occurred prior to the 2006 renewal, as operation of the mine, as well as reliance upon the BHES order, was mentioned during the public permit renewal process at that time. AR10B / 6293 (recognizing that, in 2004, "MMI

22

submitted an application for a hard rock operating permit to the DEQ"); AR6C / 4576 (stating that "permit limits have been calculated based on this ruling by the BHES, biological monitoring requirements in accordance with the BHES Final Decision and Statement of Reason"). The Department received and answered questions about these issues at that time.

¶33 While conflicting statements were made about abandoning the Noranda mine project, the MPDES Permit itself remained active "so long thereafter as necessary,"[5] according to the BHES order itself, and as a matter of law. *See* 1993 Mont. Laws ch. 595, § 10; *see also Mines MGMT, Inc. v. Fus*, 2019 MT 276, ¶ 9, n.6, 398 Mont. 15, 453 P.3d 371 (stating "[n]otably, relevant federal and state permitting persisted"). But beyond that, as a matter of fact, the record indicates that operation of the mine was clearly revived as a purpose of the Permit in 2004 and was specifically considered during the 2004-2006 Permit renewal process, where reliance upon the BHES was raised and adopted by DEQ following public participation. For better or worse, that reliance was specifically defended by DEQ in response to public comments at that time. Because it was not challenged then, it appears to me the issue was waived. To permit a challenge now upon an issue that could have been

---

[5] The Court takes issue with this language as applied to MMI in its 2004 application, stating that MMI's actions cannot be imputed to Noranda. Opinion, ¶ 24, n.6. However, according to the BHES order, "[t]he provisions of this Order *are applicable to surface and ground water affected by the Montanore Mine Project*," AR7A / 4641 (emphasis added), not to any specific business entity. Consequently, the Court's focus on the formulations of the entities is largely a red herring; there was never a termination of the permit, but one continuous process. DEQ's reliance on the BHES Order was a central issue during the 2006 renewal, conducted by a public process wherein the issue was raised and answered by DEQ, and could have been appealed at that time.

raised in 2006, even if meritorious, results in the loss of 14 years of effort, a tremendous waste, and demonstrates the necessity of proper application of the governing rules and of waiver.

/S/ JIM RICE